## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

YESHIVA GEDOLA NA'OS YAAKOV, INC.,
a New Jersey nonprofit corporation, and ZEBRA
HOLDINGS II LLC, a New Jersey Limited
Liability Company,

          Plaintiffs,

vs.

TOWNSHIP OF OCEAN, N.J. and ZONING
BOARD OF ADJUSTMENT OF THE
TOWNSHIP OF OCEAN,

          Defendants.

Civil No. _____

COMPLAINT

## **COMPLAINT**

       Plaintiffs YESHIVA GEDOLA NA'OS YAAKOV, INC., a New Jersey nonprofit

corporation (the "Yeshiva"), and ZEBRA HOLDINGS II LLC, a New Jersey Limited Liability

Company, by and through their attorneys, Wilentz, Goldman & Spitzer P.A., hereby complain of

Defendants TOWNSHIP OF OCEAN, N.J. and BOARD OF ADJUSTMENT OF TOWNSHIP

OF OCEAN (collectively, the "Defendants") as follows:

### NATURE OF ACTION

       1.    This action is commenced by Plaintiffs to redress violations of civil rights, as

protected by the Free Exercise and Equal Protection Clauses of the United States Constitution,

42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C.

§ 2000cc *et seq.* ("RLUIPA"), the Fair Housing Act, 42 U.S.C. § 3604 ("FHA"), and the New

Jersey Law Against Discrimination caused by the Defendants' burdensome, discriminatory and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit the Yeshiva from using property for a post-secondary Orthodox Jewish religious boarding school, known as a "*yeshiva gedola*," in an already-existing school structure on property located at 1515 Logan Road, Ocean Township, New Jersey (the "Property").

2.     Defendant TOWNSHIP OF OCEAN's (the "Township") land use regulations prohibit the Yeshiva's land use outright throughout its jurisdiction, because post-secondary religious schools are prohibited throughout the Township, while certain secular post-secondary schools are permitted, and because dormitory facilities, which are conditionally permitted within the Township and on the Yeshiva's property, are limited to students who are less than eighteen years of age.

3.     On December 1, 2015, the Defendant ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF OCEAN (the "Board") denied a use variance to the Yeshiva to permit its religious land use.

4.     Furthermore, substantial opposition raised by the Ocean Township community was motivated by hostility and animus toward the Orthodox Jewish community, which opponents called (among many other things) "locusts," "religious zealots," a "cult," "[s]cumbags," "dirty" and "Long coat gangsters."   Ocean Township residents opposed to the Yeshiva packed Board hearings in order to delay the application, shut down proceedings because of capacity limitations, and prolonged proceedings with lengthy, repetitive, irrelevant and improper testimony and questioning of Yeshiva's witnesses.  This animus resulted in the Board's protracted 511-day review of the Yeshiva's use variance application, far beyond the statutory

requirement of 120 days under New Jersey law. The Board also refused to place reasonable restrictions on objector questioning and testimony, and refused to schedule sufficient hearings to render a timely decision. The Yeshiva had repeatedly consented to continuations of the Board's hearings on the application, but could not continue to consent to proceedings that were going to continue for at least one to two more years while its temporary facilities are soon going to become unavailable. This led to the Board's ultimate denial "without prejudice," where it refused to deny the use variance on its merits but stated that it was unwilling to render such a decision without granting the objectors unlimited time to oppose the application, New Jersey law notwithstanding.

## PARTIES

5.     Plaintiff YESHIVA GEDOLA NA'OS YAAKOV, INC. is a domestic nonprofit corporation formed under the Laws of the State of New Jersey on April 1, 2014.

6.     Plaintiff ZEBRA HOLDINGS II LLC is a New Jersey limited liability company and owner of the property that is subject to this litigation.

7.     Defendant TOWNSHIP OF OCEAN, N.J. is a municipal corporation of the State of New Jersey, having offices at 399 Monmouth Road, Oakhurst, NJ 07755 which, through the governing body, adopted the Ordinance in question in this matter.

8.     Defendant ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF OCEAN is a board of adjustment duly appointed pursuant to N.J.S.A. 40:55D-69 to consider applications for site plan approval and variances under New Jersey's Municipal Land Use Law ("MLUL") (N.J.S.A. 40:55D-1, *et seq.*).

## JURISDICTION AND VENUE

9.    The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 2000cc *et seq.*, 42 U.S.C. § 3604, and 42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VIII, IX and X under 28 U.S.C. § 1367(a) for claims brought under New Jersey law.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

### Plaintiff Yeshiva's Religious Exercise

11.    Plaintiff Yeshiva was incorporated specifically for the purpose of operating a *yeshiva gedola*.

12.    A *yeshiva gedola* is an institution for higher education in the study and practice of the Jewish Torah and Talmud.

13.    A *yeshiva gedola* is analogous to a seminary or monastery in other religious traditions, and is a religious institution for the study, practice and training of skilled Jewish clergy.

14.    The Yeshiva's program will be a four-year course of study, which will qualify students for post-graduate Talmudic studies and practice.

15.    The Yeshiva's curriculum is mainly structured on the study of the Talmud.  There

are three different Talmud courses: Talmud Intensive, Talmud Research and Talmud Survey.  In addition, students also study *Halacha*, or Jewish Law, and *Mussar*, or Jewish Ethics and Philosophy.

16.     The Talmud comprises the central core of the Torah's oral tradition passed down for generations since the year 1312 BCE.  The Babylonian sages completed the Babylonian Talmud over 2000 years ago.  The Talmud is a compilation of legal, historical and ethical case studies and didactic texts is written in a combination of ancient Aramaic and Hebrew.

17.     Studied over the centuries, Jews have built upon this foundation of traditional wisdom over the course of the Diaspora, and thousands of companion volumes have been authored to elucidate and elaborate upon these ancient texts.

18.     The study of Talmud is complex and demanding.

19.     A Talmudic scholar known as a *Talmid chacham* is an expert in the entire Babylonian Talmud both the text and its commentaries. The goal of becoming a *Talmid chacham* is a lifelong endeavor, avidly pursued by serious students for decades.

20.     The objective of the Yeshiva's program is to give students the skills and the methodology for such advanced Talmud study.  At the same time, the program seeks to equip the student with a broad content base so that he has mastered a wide-range of Talmudic laws and principles.

21.     Two important methods of studying the Talmud are the *chavrusa*, or study partner, system and *shiurim*, or faculty lectures.

22.     The Yeshiva intends to use both methods of study.

23.     The Yeshiva is an elite institution, with a distinguished faculty, which admits only

a small number of students (fewer than one hundred) who have high-level academic and moral credentials.

24.     Students applying to the Yeshiva must demonstrate high levels of academic achievement and character, and are subjected to examinations and interviews with their teachers, religious leaders and associates.

25.     Students at the Yeshiva must also remain unmarried during this phase of their education.

26.     The Yeshiva's *rosh yeshiva*, or head of the school, is a renowned and distinguished Talmudic scholar and teacher.

27.     It is the Yeshiva's sincerely held religious belief to offer this program.

28.     The Yeshiva further believes that such an institution is necessary for the Jewish community.  In prior centuries such institutions principally existed in Europe, but many of them were destroyed or closed during the *Shoah* (the Holocaust) in the 1930s and 1940s.  As a result, there are far too few such institutions, especially ones of high caliber, like the one proposed by the Yeshiva.

29.     It is the Yeshiva's sincerely held religious belief that the *yeshiva gedola* should be isolated from the students' traditional environment of Orthodox communities such as Lakewood, New Jersey or Monsey, New York.  This is similar to a seminary or monastery.

30.     The Yeshiva believes that it is essential that students of the *yeshiva gedola* should be removed from the distractions of secular life so that they may concentrate on their studies, experience a community of dedicated religious practitioners and scholars, and single-mindedly devote all their attention to spiritual development and with appropriate models and guides as to

how to live their lives in accord with the Torah.

31.     The Yeshiva's beliefs about the importance of isolated, full-time communities for these studies and lifestyle is based on its deep understanding of the meaning of the Torah.

32.     The Yeshiva believes that the Torah is a spiritual study, not simply a secular, academic subject.  It was given by the grace of G-d.

33.     The Yeshiva believes that serious Torah students must work constantly on purifying and refining their character, their mind and their bodies to be able to be "worthy vessels" of receiving the Torah.

34.     Rabbi Shlomo Lesin, a member of the Board of Directors of the Yeshiva, describes this religious need as follows:

> "Imagine a pipeline for receiving pure water.
>
> If the pipeline is entirely clogged with filth, no water can get through.
>
> If the pipeline is partially open, but not clean, some water may get through, but not pure water.
>
> If the pipeline is pristine and wide open, a strong flow of pure water will come through.
>
> Now, at YGNY, we are training young men, at the prime of life, to become lifelong worthy vessels to receive G-d's gift of Torah understanding.  However, as they are on the threshold of becoming of age to marry and begin their families, there is also a very strong pull to fulfill those needs. The only way we can help them, especially during these challenging years, become the most elevated and spiritually attuned leaders that they strive to become, is to immerse them in a sea of Torah study and protect them from any of the myriad distractions that could interfere with their quest for holiness.

35.     The Yeshiva sincerely believes that the Torah, correctly understood, is not simply a text.  Historically, it has always been understood that the Torah has two parts, a "Written Torah" and an "Oral Torah."

36.     The main part of the written Torah is the Pentateuch or Five Books of Moses, eight books of the Prophets, and eleven books of the Writings. However, this comprises but a fraction of the studies called Torah. The Yeshiva believes that there is a much larger segment of the Torah, which is called the Oral Torah. It is so called because it is understood that a student should study with a Rabbi who is a teacher and a mentor and who could give the student the fullest understanding possible of the material and who could see his reactions, gauge his comprehension and also serve as a role model of how to live these truths.

37.     In order to fully engage in such learning from the character and behavior of the teachers, the Yeshiva sincerely believes that it is vital that *yeshiva gedola* students live in a religious scholarly community separated from secular life.

38.     The Yeshiva believes in the command set forth in the Mishnah, which deals with ethical behavior, to "Exile yourself to a place of Torah and do not assume that it (Torah study) will come after you, [or] that your colleagues will cause it to remain with you; and do not rely on your own understanding." (Chapters of our Fathers: Chapter 4, Mishnah 14.)

39.     The Yeshiva believes that the word "exile" is intentionally used to indicate separating oneself from the distractions of outside influences.

40.     The Yeshiva believes that it is important that teachers at a *yeshiva gedola* must provide vital moral and spiritual examples to their students and closely supervise the students' moral and spiritual development. The inability to maintain a proper full-time environment for the students and to observe and supervise their conduct greatly burdens that practice.

41.     The inability to provide dormitories for students also means that the Yeshiva's students may be exposed to inappropriate people, experiences and influences while outside the

8

school, inhibiting their development of the proper moral and spiritual frame of mind.

42. Furthermore, the Yeshiva believes that students must not study privately in their own houses, but rather they should be part of a learning community, such as proposed herein.

43. The Yeshiva therefore sincerely believes that students should establish a separate area, far from outside distractions, to be able to totally immerse themselves in an atmosphere of striving to reach the greatest heights in their understanding of their laws and ethics.

44. In order to exercise its religious beliefs, the Yeshiva requires a location for its *yeshiva gedola* for up to 96 students, who will be boarded.

45. Because land use approvals for the Property were not achieved by September 2014, when they had hoped they could commence, the Yeshiva had to find a temporary, substandard facility to provide for the students who had enrolled.

46. The Yeshiva currently rents premises at 911 Somerset Avenue, Lakewood, New Jersey that provide classrooms for the students and living facilities for 33 of them.

47. However, two-thirds of the students currently have to be housed outside the school in the surrounding community.

48. For the reasons set forth in the preceding paragraphs, the Yeshiva believes that it is a necessary exercise of its religious beliefs to provide a *yeshiva gedola* with dormitories for its students.

49. The formal daily schedule for all students at the Yeshiva's school begins at 7:30 a.m. and ends at 11:15 p.m. At its temporary facilities, the lack of dormitory rooms for all students has resulted in the entire student body not participating in early and late prayer services.

50. It is the Yeshiva's sincere belief that all of its students should pray together as a

9

body.

51.    The lack of dormitory rooms for all students severely inhibits the religious education and practices of the Yeshiva and the Yeshiva's students.

52.    The lack of dormitory rooms for all students prevents the Yeshiva's faculty from maintaining full-time supervision of the students' spiritual and moral development.

53.    The lease for the Lakewood facility expires on August 19, 2016.

54.    The owner of the Lakewood facility is not willing to renew the Yeshiva's lease after August 19, 2016.

55.    The Yeshiva will therefore be left with no facility in which to provide religious education or practice.

56.    Once it has a permanent facility, the Yeshiva will seek accreditation from the New Jersey Department of Higher Education to offer a Bachelor of Talmudic Studies Degree.

57.    The Yeshiva cannot petition the New Jersey Department of Higher Education for accreditation since its does not yet have approval to use its property for its institution of higher education.  Information about the facilities that will house the program are a necessary part of the information that must be provided to the Department.

58.    The lack of timely approvals by the Board, which is necessary to permit accreditation by the Department of Higher Education, has also prevented students and potential students from obtaining financial aid and student loans to attend the Yeshiva, further discouraging students from attending the school.

59.    The Yeshiva sought a suitable location for its *yeshiva gedola* for nearly a year and was unable to find one in Ocean Township that was equally suitable for their religious exercise.

<u>The Property and Its Location</u>

60.     On or about September 13, 2013, the principals of the Yeshiva identified the subject property located at 1515 Logan Road, Ocean Township, New Jersey (Block 216 Lot 19) as a potential site for its *yeshiva gedola* (the "Property").

61.     The Property is owned by Zebra Holdings II LLC ("Zebra"), who had purchased it from the prior yeshiva operating a school on the Property.

62.     Initially, the principals of the Yeshiva leased the facilities from Zebra.

63.     Subsequently, after consideration of its need for a permanent home, the Yeshiva decided to purchase the Property from Zebra.

64.     The Yeshiva is a contract purchaser of the Property.

65.     The Property is a 2.927-acre parcel with approximately 336 feet of frontage on Logan Road in Ocean Township.

66.     The Property is improved with an existing two-story 17,714 square foot structure that has always been used for educational purposes.

67.     The Property is uniquely situated to accommodate the Yeshiva's religious exercise.

68.     After having engaged in a diligent search for a location, the principals of the Yeshiva had not found any other property that can accommodate its religious exercise.

69.     No other property within Ocean Township can accommodate the Yeshiva's religious exercise.

70.     The Property had been previously used as a boarding school in 1997 for students

in grades 9 through 12.

71.    The prior boarding school on the Property was limited to a maximum of 50 persons on the site between the hours of midnight and 6 am.

72.    That school had also operated with 100-150 day students in addition to the boarding students.

73.    The previous boarding school was in operation for several years until that use was discontinued.

74.    After the prior boarding school use was discontinued, the Property has been used as an elementary day school by the Yeshiva at the Jersey Shore, which is currently leasing the Property from Zebra.

75.    The Yeshiva at the Jersey Shore currently operates with 101 students.

76.    The allowable occupant load for the current use of the building is 312 occupants.

77.    The current elementary day school use results in approximately 46 vehicle trips during weekdays peak hour (26 a.m./20 p.m.).

78.    The Yeshiva at the Jersey Shore currently uses approximately fifteen parking spaces during weekdays.

79.    The Property is located in a transitional area, between multi-residential apartment buildings, commercial uses, the Dave Dahrouge Park and single family residences.

80.    The following aerial photograph of the Property and its environs was taken from Google Maps:



81.    The Property is zoned "R-4," the Township's "Medium Density Single-Family Residential" zoning district.

82.    The Property is directly adjacent to three parcels zoned "C-3," the Township's "General Commercial Zone."

83.    The C-3 General Commercial Zone includes various nonresidential permitted uses such as "appliance store," "bank," "cafeteria," "club," "department store," "diner," "general office buildings," "health clubs," "home furnishings," "museum," "music and dance studios," and "nursing home," among many others.

84.    The Property is directly adjacent to a parcel zoned "R-7," which is the Township's "Garden Apartment Residential" zoning district.

13

85.    Multi-family dwellings are permitted in the R-7 zoning district, which permits 10 units per acre.

86.    Directly behind the Property is the Wanamassa Gardens apartment complex, which contains approximately 66 1- and 2-bedroom apartment units.

87.    The nearest apartment building is 120 feet from the Property.

88.    Approximately 20 feet east of the Property is a parcel that is occupied by the Master Secure Storage self-storage facility.

89.    Located within approximately 400-700 feet and one block of the Property are various commercial land uses, such as a Dunkin Donuts, laundromat, delicatessen, bagel shop, realtor, chiropractor, dentist's office, flooring supply store, kitchen and bath showroom and design center, furniture store, post office, diner, pharmacy, Chinese restaurant, laundromat, bank, auto lube, and gas station.

90.    The Ocean Plaza shopping center, located approximately 1,000 feet west of the Property, contains retail uses such Staples, Stein Mart, Wegmans, Pier 1, Panera Bread, Verizon Wireless, Taco Bell and Bank of America.

91.    The Property is an ideal location for the Yeshiva's proposed land use.

92.    On January 14, 2014, notably prior to filing an application, an attorney and planner for the Yeshiva met with the Township Manager and the Director of Community Development to gauge their informal opinion on a yeshiva with boarding that would include post-high school students in this location.

93.    The Township's representatives reacted positively to the proposal.

94.    Based on the positive feedback received by the Township representatives, the

14

Yeshiva filed its application for a use variance.

The Township's Land Use Regulations

95.     Ocean Township regulates land use in its jurisdiction in part through its Land Development Ordinance ("LDO").

96.     The Yeshiva's religious land use is prohibited throughout Ocean Township for two separate reasons.  First, religious schools for adults beyond Grade 12 are not permitted anywhere in the Township's jurisdiction; and second, because boarding schools are restricted to students under 18 years of age in the two zoning districts, including the R-4 district, where boarding schools are permitted.

97.     Ocean Township's LDO states "[e]xcept as hereinafter provided, no building or structure or part thereof, and no lot or land or part thereof, shall hereinafter be used except in conformity with the regulations herein prescribed," and "All uses not specifically permitted in a zone are specifically prohibited in that zone."

98.     The LDO restricts "private" and "parochial" schools to entities that provide instruction from "Kindergarten through Grade 12."

99.     The LDO does not permit post-secondary educational institutions except for certain secular educational institutions as described below.

100.    A *yeshiva gedola* provides instruction for post-secondary level religious students.

101.    A *yeshiva gedola*, with or without accessory dormitories, is thus prohibited everywhere within Ocean Township.

102.    Under the LDO, in the R-4 zoning district "customary accessory uses and

15

structures which are clearly incidental to the principal structure and use" are generally permitted as accessory to a permitted principal land use.

103.   Dormitories are accessory uses and structures that are customary to schools.

104.   However, the LDO also contains specific limitations on accessory dormitories.

105.   Boarding schools (for students up to 18 years of age) are permitted only within the R-2 and R-4 residential zoning districts.

106.   The LDO states that, for both the R-2 and R-4 zoning districts, "Boarding students shall be in grades 9 thru 12 and in no case shall a boarding student be older than 18 years of age at the beginning of the academic year."

107.   A *yeshiva gedola* provides instruction to students generally between 18 and 22 years of age.

108.   The Yeshiva's land use, and any *yeshiva gedola* land use, is therefore prohibited throughout Ocean Township.

109.   The Township's explicit prohibition against dormitories for students above the age of 18 was specifically targeted at Orthodox Jewish educational institutions.

110.   The Township's Planner stated that he "ha[d] intimate knowledge of, and can explain to the Board the reasons for this very strong language.  First, the Ordinance was developed as the result of a rezoning request by the former [Orthodox Jewish] operators of this site.  That request was geared towards this site."

111.   The Township specifically accommodates Christian religious practices by permitting "parochial schools" in addition to "private schools."

112.   The Township has not similarly accommodated Jewish religious practices, as

16

Jewish males traditionally attend *yeshivot* for longer periods into their early 20s.

113.   The Township permits other nonreligious schools for students older than 18 years of age, including "Art schools," "Dance schools," "Music schools," and "Business schools."

114.   The Township treats the Yeshiva's religious land use on less than equal terms as nonreligious educational land uses.

115.   Boarding schools are only permitted in the R-2 and R-4 zoning districts.

116.   Boarding schools are prohibited in the Township's commercial, industrial, office, and residential zoning districts other than the R-2 and R-4 districts.

117.   The minimum lot size for a school in the R-2 zoning district is 7.0 acres for a school up to 350 students.

118.   The minimum lot size for a school in the R-4 zoning district is 2.0 acres for a school with up to 150 students.

119.   The R-4 zoning district therefore permits more intensive and higher density school development than an R-2 zoning district.

120.   The Yeshiva's proposed use is most appropriately located within the Township's R-4 zoning district.

121.   The Township's LDO states that the purpose of the R-4 residential zone "is to provide for smaller lot sizes to meet the desires of a certain segment of the population who need and desire lower cost housing and to zone the area in conformance with existing lot sizes. The provisions and regulations set forth herein encourage the future development and maintenance of this area as a residential area."

122.   The following uses are included as uses permitted within the R-4 zone subject to

meeting certain conditions: "Government buildings and services which are necessary to the health, safety, convenience, and general welfare of the inhabitants of the municipality," "Public utility installations," "Churches, synagogues, parish houses, and similar religious uses," "Public schools, parochial schools and boarding schools," "Senior citizen housing complex," and "Community Recreation Center."

123.   Permitted assembly and institutional land uses within the R-4 zoning district, including government buildings and services, public schools, senior citizen housing complexes and community recreation centers, would have similar or greater impacts on the Township's regulatory purpose(s) as the Yeshiva.

124.   The Yeshiva's religious land use is treated on less than equal terms as other nonreligious assembly and institutional land uses within the R-4 zoning district.

125.   "Senior citizen housing complex" is a permitted conditional use within the R-4 district. Such a use permits a density of 20 units per acre.

126.   Approximately fifty-eight senior citizen housing units would be permitted on the Property, which could comprise efficiency, one-bedroom or two-bedroom units.

127.   If such senior housing units were occupied by two persons on average, that could result in 116 adults living on the Property.

128.   A senior citizen housing complex in the R-4 district can have 24 units per structure.

129.   "Community Recreation Center" is a permitted use in the R-4 district.

130.   A "Community Recreation Center" is defined under the LDO as "a public or quasi-public facility offering a variety of recreational, social and educational programs and

services to the general public or it's [sic] members. Facilities may include: active recreation facilities including but not limited to swimming pools, gymnasiums, exercise rooms, outdoor courts and fields; meeting rooms; classrooms; administrative offices directly related to activities and services conducted at the community recreation center; auditoriums and theaters; libraries; and other similar facilities geared towards providing recreational or social activities or services for the general public or members. For the purposes of this Ordinance, public parks and playgrounds and their related facilities shall not be considered community Recreation Centers, but shall be considered government buildings and services."

131.   The following nonreligious assembly and institutional land uses are permitted elsewhere within the Township: "Golf Course/Country Clubs," Rehabilitation and vocational training center for the physically and/or neurologically disabled," "Family Day Care Homes," "Indoor Recreation Facilities," "Medical and dental clinic and offices," "Private schools," "Tavern," "Funeral services," "Gymnastics and martial arts studios," "Health Clubs," "Hospitals, animal," "Museum," "Nursing Home," "Physical culture and health establishments," "Shopping Center," "Quasi-public uses including clubs, lodges, and similar uses," "Child Day Care Centers," "Movie Theater, Indoor," "Club," "Social service organization," "Amusement center – game room," "Art gallery or museum," "Auditoriums," "Child care center," "Library," "Health clubs, tennis clubs, gymnasiums, indoor batting cages, and similar indoor recreational facilities," "Public uses," "Quasi-public uses," "Career counseling services and activities," while the Yeshiva's land use is prohibited throughout the Township's jurisdiction.

132.   The Yeshiva's religious land use is treated on less than equal terms as other nonreligious assembly and institutional land uses, as such uses would have similar or greater

impacts on the Township's regulatory purpose(s) as the Yeshiva.

133.    The Township discriminates on the basis of religion by permitting K-12 parochial schools in the R-4 zoning district and prohibiting the Yeshiva's land use.

134.    "Parochial schools" would have similar or greater impacts on the Township's regulatory purpose(s) as the Yeshiva.

135.    In New Jersey, an applicant seeking to use property for a use not permitted within that zoning district may apply to the municipality's zoning board of adjustment for a use variance, otherwise known as a "D-1" variance, pursuant to the Municipal Land Use Law ("MLUL"), N.J.S.A. 40:55D-70d.

136.    Under New Jersey law, the applicant must demonstrate that the proposed use meets the positive and negative criteria to support the variance request.

137.    A religious institution and a school are considered "inherently beneficial" uses under New Jersey law, thus satisfying the positive criteria as a matter of law.  N.J.S.A. 40:55D-4; House of Fire v. Clifton Bd. of Adj., 379 N.J. Super. 526, 535 (App. Div. 2005).

138.    An applicant must also satisfy the negative criteria by demonstrating that the variance can be granted without causing substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance. N.J.S.A. 40:55D-70d.

139.    The Board is required to conduct the four part test set forth in Sica v. Board of Adjustment of Tp. of Wall, 127 N.J. 152, 162-166 (1992), to determine whether the use meets the statutory negative criteria.

140.    If the Board identifies any negative impacts it must then determine whether these

detrimental effects can be reduced by imposing reasonable conditions on the use.

141.   A "D" variance requires a supermajority or five affirmative votes for approval.

142.   Consideration by the Zoning Board of Adjustment of a "D" variance is an individualized assessment of the proposed use for the property involved.

143.   New Jersey law and the Board's Rules Governing Internal Affairs require that the zoning board of adjustment must issue a decision on a use variance within 120 days after an application is deemed complete.

144.   If a decision on a use variance is not issued by the Board within 120 days, the applicant is entitled to receive an automatic approval under New Jersey law. N.J.SA. 40:55D-76c.

The Variance Application and
Substantial Community Hostility to the Yeshiva's Religious Land Use

145.   The Yeshiva submitted its application for "C" and "D" variances and minor site plan approval (the "Application") by hand delivery on June 11, 2014.

146.   The Application stated in part that "Applicant seeks approval for an advanced Talmudic academy, wherein the students are proposed to board onsite while school is in session. Applicant proposes a maximum of 96 students ranging in age from 18 to 22 years old."

147.   No new structures were proposed in the Application.

148.   The Yeshiva's proposed use of the existing structures, as amended, would include a study hall, classroom, library, kitchen, dining room, mechanical room, lobby, restrooms, shower room, offices, a resident faculty suite, and several 4-student dormitory rooms.

149.   The space devoted to dormitories exceeds that required by the International

21

Building Code 2009, New Jersey Edition.  Fifty square feet gross floor area is required per occupant, and the Yeshiva's plans exceed that requirement by 20%.

150.    The Yeshiva planned on improving the physical appearance of the existing structure and landscaping with an attractive design, as described by the following rendering of the front of the planned *yeshiva gedola*:



151.    On July 8, 2014 additional plans were requested by the Defendants, indicating that upon receipt the matter would be deemed complete.

152.    The Township sent the Yeshiva a letter on September 23, 2014 scheduling the first hearing on the Yeshiva's application for October 23, 2014.

153.    On October 23, 2014, the first hearing was held on the Yeshiva's application.

154.    On November 13, 2014, the second hearing was held on the Yeshiva's application.

155.    On December 11, 2014, the third hearing began on the Yeshiva's application, but capacity of the room was reached and the hearing was continued.

156.    On December 18, 2014 the Board contacted the Yeshiva's attorney to set the next hearing date.  The earliest date offered was 56 days later, on February 5, 2015.

157.   At the January 8, 2015 meeting of the Zoning Board of Adjustment, the Board did not conduct a hearing on the Yeshiva's application, but scheduled a special meeting on February 24, 2015.

158.   On February 24, 2015, the Board held the fourth hearing on the Yeshiva's application.

159.   At the March 12, 2015 meeting of the Zoning Board of Adjustment, the Board did not conduct a hearing on the Yeshiva's application, but scheduled a special meeting on May 18, 2015, or 67 days after the last hearing.

160.   On May 18, 2015, the Board held the fifth hearing on the Yeshiva's application.

161.   At the June 3, 2015 meeting of the Zoning Board of Adjustment, the Board did not conduct a hearing on the Yeshiva's application, but scheduled a special meeting on July 15, 2015, 58 days after the prior hearing.

162.   On July 8, 2015, the Yeshiva amended its application to bifurcate the use ("D") variance application from site plan approval and "C" variances.  Thereafter, only the Yeshiva's "D" variance application remained.

163.   On July 15, 2015, the Board held the sixth hearing on the Yeshiva's application.

164.   However, the July 15, 2015 hearing was quickly shut down because of overcrowding, as described below.

165.   The next hearing date was scheduled for September 30, 2015, 77 days after the prior truncated hearing.

166.   On September 30, 2015, the Board held the seventh hearing on the Yeshiva's application.

167.    On October 7, 2015, the Board held the eighth hearing on the Yeshiva's application.

168.    On October 30, 2015, the Board contacted the Yeshiva's attorney to set the next hearing date.   The earliest date offered was December 1, 2015, 55 days after the previous hearing.

169.    On December 1, 2015, the Board held the ninth and final hearing on the Yeshiva's application.

170.    The Board denied the Application "without prejudice" on December 1, 2015.

171.    There will be no detrimental impact resulting from the Yeshiva's proposed use regarding issues of noise, odors, visual impact, drainage, traffic, or other legitimate land use concerns.

172.    The Planning Consultant to the Zoning Board of Adjustment, James W. Higgins, submitted his report concerning the Yeshiva's application to the Board on October 22, 2014.

173.    The only comments provided by the Township of Ocean Police Department were suggestions that the Yeshiva provide "adequate parking lot lighting for the overnight hours" and a "security system with warning signs posted indicating that the interior and exterior of the building and parking lot are under surveillance . . . ."

174.    The Yeshiva is willing to implement both suggestions of the Township of Ocean Police Department.

175.    The only comments provided by the Township of Ocean Police Department's Traffic Safety Bureau were that "there is adequate signage at the north driveway noting that it is an entrance only" and that "there is adequate signage where the driveway is one way in front of

the building."

176.    The Yeshiva is willing to implement both suggestions of the Township of Ocean Police Department's Traffic Safety Bureau.

177.    Although the Yeshiva's use is not a boarding school as defined by the Township's zoning regulations, it meets the conditional use requirements for parochial boarding schools in the R-4 zoning district, with the exception of existing site nonconformities and the age and number of students.

178.    The Property's lot area is 2.927 acres, larger than the minimum lot area of 2.0 acres.

179.    The Property's lot width is 334 feet, greater than the minimum lot width of 200 feet.

180.    The Property's lot depth is 362 feet, greater than the minimum lot depth of 200 feet.

181.    The Yeshiva's proposed front yard setback is 66 feet, greater than the minimum front yard setback of 50 feet.

182.    The Yeshiva's proposed side yard setback is 22 feet, which does not meet the minimum side yard setback of 40 feet but is an existing condition of the Property.

183.    The Yeshiva's proposed rear yard setback is 163 feet, greater than the minimum rear yard setback of 60 feet.

184.    The Yeshiva's proposed floor area ratio is 14.5% feet, less than the maximum floor area ratio of 30%.

185.    The Yeshiva's proposed building height is 27 feet and 2 stories, less than the

maximum building height of 30 feet or 2 stories, whichever is less.

186. The Yeshiva's proposed use will comply with the prohibition on outdoor lighting for boarding schools.

187. The Yeshiva's proposed use will comply with the prohibition on outdoor recreational or group activities after 9pm for boarding schools.

188. The Yeshiva's proposed use will comply with the prohibition on student ownership of automobiles and pets for boarding schools.

189. The Yeshiva's proposed use would reduce the traffic impact of the Property, as compared to the current use, as students would reside on-site.

190. During the morning and afternoon peak hours, the Yeshiva's proposed use would generate only a small fraction of the vehicle trips generated by the current use of the Property.

191. The Yeshiva will reduce the amount of impervious surface on the Property, improving environmental conditions.

192. There will be no negative noise impacts from the Yeshiva's use.

193. Sound generated by the natural human voices of students and faculty will not be audible at the nearest property line.

194. The Yeshiva will not use amplified sound in the evenings.

195. Any land use impacts from the Yeshiva will be less than the existing school use.

196. The Board's Planner and Engineer suggested several conditions that the Yeshiva's use could be subject to in order to mitigate any perceived effects of the use. The Yeshiva agreed to such conditions or proposed other conditions, including the following:

- Students will not be able to have or operate automobiles while attending the

26

Yeshiva.

- Modification of driveway and parking spaces to eliminate impact on nearest neighbor.

- Elimination of parking along the front elevation.

- Placement of landscape buffering between the *yeshiva gedola* and the nearest neighbor.

- Relocation of loading and trash areas.

- Replacement of fencing.

- Improvements in layout and façade of building.

- Alarming an egress door facing a neighbor to prevent it from being used regularly by students.

- Students will be prohibited from smoking, drinking alcohol or using drugs.

- Students will be prohibited from owning or using televisions or radios.

- Students will not be leaving the premises to go to shopping facilities.

- Provision of a security system.

- Students will be required to remain on campus at all times while school is in session and shall not be permitted to use the nearby public park.

- The windows in study room (existing gymnasium) would have shades at night to block light from the use to the neighbors.

- Windows in the study room shall remain closed at all times while the room is in use.

197.    Further, the Yeshiva has repeatedly stated that it will abide by any reasonable

conditions imposed upon its use by the Board.

198.   As the Yeshiva's proposed use will either positively impact or have no effect on land use conditions within the Township, there is no legitimate basis for the extraordinary community opposition described below.

199.   Given the lack of actual impacts and the willingness to mitigate by the Yeshiva, the bases stated by community members opposed to the Yeshiva's use is pretextual and demonstrates that such opposition is in fact based on hostility and animus to Orthodox Jews.

200.   As all legitimate land use impacts have been addressed, the opposition of local residents has been reduced to (a) unsubstantiated, undefined and biased fears about the men attending the Yeshiva; (b) concern that such men will use the public park, even though the Yeshiva has agreed to a condition that they will be prohibited from doing so; and (c) concern that the prayer and studying of students inside the building will create noise impacts on one neighbor, despite scientific evidence that the voices will not be audible at the neighbor's property line, much less in his house.

201.   Significant evidence demonstrates community hostility and animus towards Orthodox Jews in Ocean Township.

202.   On his personal Facebook page, Ocean Township Mayor Christopher Siciliano expressed hostility toward the Yeshiva's proposed use, writing a statement expressing outrage against members of the Board of Education for attempting to make the Ocean Township High School gymnasium unavailable for a hearing on the Yeshiva's application, which could have led to automatic approval of the Application.

203.   Among Mayor Siciliano's comments was the statement "No Dorm on Logan

Road almost approved by default!" (The ungrammatical phrase is explained by the fact that the phrase "No Dorm on Logan Road" is the slogan used by the Yeshiva's opponents, as described below.)

204.   Mayor Siciliano's use of the phrase "No Dorm on Logan Road" indicates his hostility to the Yeshiva and its students.

205.   Mayor Siciliano expressed outrage that "the application was almost approved by default."

206.   Mayor Siciliano further stated: "we are all in this together!" and "The 2 board members thought they were more important than the hundreds of residents that wanted to hear this application."

207.   The Township's Mayor also stated on Facebook: "even applications we may not feel is good for the community or goes against our moral beliefs, if it's legal, then it can be heard as an application.  Please be patient, that's all we ask!," referring to the Yeshiva's application.

208.   The Township's Mayor further stated: "And after all, we are your advocates, never forget that!  We understand that, and appreciate that you voted for us and entrusted us to do what is right for you and the entire community at large!"

209.   In late November, 2015, immediately prior to the final Board hearing on the Yeshiva's application, Defendant Board member John Napolitani was observed socializing with John Poulos, the objectors' attorney, at which time it was noted that Poulos is the attorney objecting to the Yeshiva.

210.   Ocean Township residents organized a coordinated opposition to the Yeshiva's application.

211.    Ocean Township residents opposed to the Yeshiva's use hold meetings and regularly communicate and organize to present a united front against the Yeshiva.

212.    One leader of the residents' opposition stated: "We will need one voice to represent the community. We don't want to go into the next meeting with a bunch of angry protesters. We will hire a high powered attorney to represent us. Any thoughts or views please let's discuss. The cost will be minimal with everyone pitching in."

213.    The opposition to the Yeshiva by Ocean Township residents is motivated by hostility and animus toward Orthodox Jews.

214.    Specifically, many Ocean Township residents hold animus toward the Orthodox Jewish community in nearby Lakewood, New Jersey.

215.    Such hostility by many residents of Ocean Township includes unsubstantiated fears of, and prejudice against, Orthodox Jewish men.

216.    This animus was a substantial component of Ocean Township residents' motivation to oppose the Yeshiva's use, their participation in the effort to prevent the Yeshiva's use, and their attempt to create unreasonable delay in the Board's hearing of the Yeshiva's application.

217.    As described below, the overwhelming opposition of the Ocean Township community to the Yeshiva has extended proceedings on the Application to greater than four times the required statutory period, with no foreseeable end.

218.    Such delays prevented the Yeshiva from being able to engage in religious exercise in Ocean Township, and would have caused irreparable injury to the Yeshiva upon the ending of its lease for the temporary Lakewood Township facility in August 2016.

219.   Ocean Township resident Christine Schmitt started an online petition on "Change.org" titled "VOTE "NO" IN THE MATTER OF THE APPLICATION OF YESHIVA GEDOLA NA'OS YAAKOV, INC. FOR PREMISES KNOWN AS LOT 19 IN BLOCK 216 ON THE OFFICIAL TAX MAP OF THE TOWNSHIP OF OCEAN."

220.   Comments from Ocean Township residents and others on the Change.org petition included:

- "Look what they did to my hometown of Lakewood. Stop the locusts from spreading throughout the state."

- "I live in the town and I want the religeous [sic] zealots stopped from bringing in more adult students. They can cgo [sic] to the catskills and build there, or go to Isreal [sic] if they want."

- "I owned property in Lakewood NJ for 24 years. Orthodox Jewish landlords made life a living hell for me there! I would hate to see this repeated in Ocean!"

- "There are plenty of other places for radical religious schools."

- "Aside from this being completely ludicrous from a homeowner standpoint, these people don't pay any taxes. They're all "Rabbi's" Don't let the word "yeshiva" fool you."

- "I don't want my towns school system to be subjugated by a home-school mentality that has seen the near destruction of the public school system of Lakewood NJ with the influx of religious based teaching which does not pay taxes and most damagingly, makes no efforts to foster greater acceptance of

other cultures and faiths."

- "This sounds more like a cult organization then a religious group."

- "This proposed dorm offers no benefits to the community, poses many potential problems, and in fact has no use for the values of the community."

- "This is my neighborhood."

- "I live here and want the town to remain EXACTLY the way it is."

221.    Opponents of the Yeshiva had an airplane with a banner reading: "NO DORM ON LOGAN ROAD! MEETING SEPT 30 OTHS 7PM!!" fly over the local beaches and Township pool during the Labor Day holiday.

222.    Many lawns throughout Ocean Township displayed signs stating: "No Dorm on Logan Road."

223.    Opponents of the Yeshiva created a "crowdfunding" campaign on the "Youcaring.com" website titled "No Dorm on Logan Road," which raised several thousand dollars.

224.    Comments on the "No Dorm on Logan Road" fundraising website included:

- "try Lakewood suckers"

- "As a secular Jew who has been treated in the past by the Orthodox as 'not Jewish enough', my perspective of the anti-semitism claims are bogus...or at least let'se [sic] accuse the ultra-Orthodox as being anti-semitic towards Conservative, Reformed, and secular Jews; anyone else remember the 8 year old Orthodox girl in Israel who was spit at and cursed at while walking to school because she was not Orthodox enough? My understanding is there are

supposed to eventually be 4 dorms, each housing roughly 100 adults, which would create a uniform voting block of 400 voting adults who don't pay taxes; are the next signs going to be 'No Dorm on Poplar'? If Lakewood is any example, this might allow the Orthodox to create a Board of Education that is almost exclusively Orthodox who's [sic] children DO NOT attend the very school system they control. Coincidentally, they bleed the local educational funds by having their kids labeled special ed and placed in a Yeshiva at almost $100k per student per year, despite the public school providing special ed services and despite the fact that other special ed students don't get placed there. And how much did that complimentary busing to religious schools cost the Lakewood school systerm [sic]? ,Finally how many homes did they try to classify as synogogues [sic] or religious schools which would allow them to avoid property taxes. By the rabbi's own statements, they want to enter the community, but be isolated from it because they don't want to be contaminated by the secular nature of the community. If any insular group wanted to establish dorms bringing a uniform voting block of 100 to 400 adults into the community, be it the Orthodox, Muslims, Westboro Baptists, or Rastafarians, I would object to it. I am sure there are anti-semites having their day, but this is not about anti-semitism. This is about outsiders creating the "infrastructure" in our community that they laude [sic] in Lakewood."

- "Uniform voting block of an insular group that has a local reputation for bleeding educational funds while disassociating themselves from the original

33

community that provide these funds? Does that work for you?"

225.    A leading opponent of the Yeshiva, Paul Mayerowitz, published the following on

Facebook in reference to a similar application in nearby Jackson Township where another

Orthodox Jewish school was seeking zoning permission to operate:



226.    In June 2014, four individuals broke into the yeshiva operating at the Property,

looted it, and defecated on school desks.  They ran away from the school into the nearby

Wanamassa Garden Apartment Complex, where they were arrested.

227.    Opponents of the Yeshiva regularly used Facebook as a means of communicating

and organizing with each other to further their attempts to prevent the Yeshiva's use from being

34

approved.

228.   A "Secret Group" on Facebook called "No Dorm on Logan Road" has been used by opponents of the Yeshiva to coordinate their opposition to the Yeshiva's application.

229.   There are approximately 2,000 members of the Facebook "Secret Group" titled "No Dorm on Logan Road."

230.   Most if not all of the Ocean Township residents that engage in vocal opposition to the Yeshiva's application are members of the "No Dorm on Logan Road" Facebook page.

231.   Comments from Ocean Township residents and others on Facebook included:

- "First Lakewood, then/now Jackson, ocean township then what?"

- "Paul, can't our board members simply say that they are voting no because the town, of which they represent, doesn't want the Talmudic? Aren't they simply our representatives??? Can't they list our reasons as their reasons??? Please let me know how I am wrong here.... Even if we need to continue to fight on an appeal , I 100% believe that the members of this town have spoken loud and clear, and our community leaders are their to serve our beliefs and interests! No??"  (Emphases added.)

- "we Do NOT WANT TO BE LAKEWOOD . It's time to take off the boxing gloves , hIt hard and fast . Lets fill the seats and show we mean business. DON'T LET THIS GET SHOVED UP OUR ASS?"

- "No dorm on logan rd. If this gets approved you will see 3 more go up in Ocean"

- "This is your town. You want to keep it or lose it? This application is only the

beginning."

- "Then they [Lakewood residents] want to send all there [sic] kids to Brick schools ...Scumbags"

- "Please attend the December 11th Meeting. Very important to keep our community the way it is."

- "If some people have nothing to contribute to our community as a group, stay where you are at! We welcome givers, not takers!"

- "They don't care about anyone but themselves. There is no respect for the community at large but we should all bend to them."

- "These 'chosen' people do not abide by the rules in our society & are raising a generation that simply cannot hold a job to support their large family. Lakewood has gone to hell & if they build in Ocean watch the 'Monsey' effect..."

- "I don't want to live in a town like Lakewood, Monsey etc. That's not living with good neighbors who share a common ideal as to community, sense of neighborhood and living/working together."

- "We all lose any value we have in our homes if we become the next Lakewood......"

- "What possible benefit could there be to changing the face of our small town to that of something like Lakewood?"

- "If this is approved...God help OT. . . . [I]t is getting very scary."

- "Lakewood is nothing to aspire to as far as a model town for ALL people.

36

'Concerned with keeping themselves spiritually clean, the Hasidim are preoccupied with ideas of biblical concepts of purity and contamination.'"

- "Hasidim also preserve their separation through a separate school system. One of the very first things the Hasidim did upon settling in America was to found schools and yeshivas."

- "[W]hat benefit is that to our community????? They still wouldn't pay taxes or contribute in any way. It is such a crime that this is even considered."

- "Their religion is male based & segregated from worshiping with women. Very similar to the Islam religion. Women are nothing!!"

- "They will not interact with or provide any contributions to the town. Women, children, minorities and all other religions are excluded."

- "Only good thing that came from them constantly mentioning Lakewood is that there is a definite connotation that comes with the word Lakewood. I kept thinking maybe the board would hear it over and over and realize Wanamassa is not and does not want the same fate as Lakewood."

- "THINK OF THE SAFETY OF YOUR CHILDREN!!!"

232.    In addition to the Yeshiva application, other topics on the "No Dorm on Logan Road" Facebook page include an Orthodox Jewish religious use in Toms River, N.J., an Orthodox Jewish religious use in Jackson, N.J., and an article discussing a housing program run by a rabbi in Lakewood.

233.    Comments posted on the "No Dorm on Logan Road" Facebook page by Ocean Township residents to a news article concerning the housing program in Lakewood include:

37

- "Perfect timing for this article.  Maybe the residents of our town will realize how important it is to attend our meetings"

- "And how many non hasidics get section 8 assistance in Lakewood.  My guess is none"

- "NOW come on down to LakeVood and see how many BRAND new Mini Vans and cars are driving around and take a GOOD look whos [sic] behind the wheel."  (The use of the term "LakeVood" is mockery of some Orthodox Jews' Yiddish accents.)

- "Here is another scoop for you in regards to Lakewood.  Apparently, my mom was viciously cut off by a cult member and called the police to report it.  The police officer told her that they don't cite cult members with traffic violations in Lakewood."

- "There needs to be an investigation by higher authorities into the illegal activity of the Hasidic people of Lakewood…."

- "[T]hey hide more of the money…..Long coat gangsters strikes again…."

234.    Such focus on Orthodox Jewish issues outside of Ocean Township on a website ostensibly created to address Ocean Township issues demonstrates significant hostility and animus towards Orthodox Jews by Township residents.

235.    Another comment on Facebook indicates hostility specifically against Orthodox Jews and not "dormitories" in general:

> Just so you all know, while spreading the word in wayside, we have realized that everyone thinks that the signs are about Monmouth university opening up a dorm in Ocean. As soon as we explain what really is happening they are immediately super concerned. Seems like most have no idea what is happening.

38

(Emphasis added.)  Another Facebook commenter similarly stated:  "That is true. Many people thought it had to do with MU."

236.    Another Ocean Township resident commented on the "No Dorm on Logan Road" Facebook page:

> these men will bring nothing to our community. A different type of dorm may bring more business to our local businesses, they could do community events, etc... These men will not shop in our stores, or our restaurants, they will not work community events... Blah blah blah nothing positive for anybody else.

237.    Further evidence that community opposition was based on hostility to Orthodox Jews is contained in another Ocean Township resident's Facebook comments: "The bigger issue . . . is the increased burden on the education budget due to the bussing issue for the <u>residents</u> <u>that</u> <u>will</u> <u>follow</u> <u>the</u> <u>yesheva</u> [sic] and be bussed to other schools. . . . The snowball effect is very real but the <u>anticipated</u> <u>degradation</u> <u>of</u> <u>the</u> <u>neighborhood</u> is irrelevant to the boards [sic] decision." (Emphases added.)

238.    The attorney for the objectors, John Poulos, also participated in such Facebook conversations.  In response to the statements "This is a reminder of the meeting at the high school tonight. 7 pm. No Dorm on Logan. Let's pack the room. Please share" and "dorm on logan and a synagogue in west end lol ... some people only see whats best for themselves,selfish greety, disrespectful who dont give a rats ass about thier nieghbors community and city..," Poulos wrote: "They need a good lawyer!!"

239.    John Poulos, attorney for the objectors, also wrote in the "No Dorm on Logan Road" Facebook page: "And just so you all know, everyone knows about this website and the contents of it - every post is being printed. Had a nice long talk with someone in the 'know'

today."

240.     Comments published on other media websites included:

- "I have a question about the 96 students. Does anything productive come out of them when they complete this school? Do they go to work or just sit home praying all day?"

- "I think that just about everyone in Monmouth Co or the municipalities surrounding Lakewood has Lakewood in the back of their mind. All the political correctness in the world cannot erase what Lakewood has become. Good, bad, indifferent, legal or not, PC or not - people in the area are well aware of Lakewood."

- "Almost sounds like these poor young men will be imprisoned."

- "Does that mean that Wanamassa and neighboring towns will become terrorism targets if this is allowed?"

- "LOOK AT LAKEWOOD ENOUGH SAID."

- "Suck our system more, never will stop.All BS"

- "Dudes email is dradel. Lol"

- "We have seen from these boarding schools in Belmar, Long Branch, Lakewood and other towns just how dirty the students are. . . . You can trust the rabbis about as far as you can throw them. The town doesn't need this sort of "inherent benefit"!"

- "Let's put it this way: you won't see real estate prices drop because the Syrians and Ashkenazis are moving in your neighborhood, nor will you see

40

them collecting welfare and food stamps while giving all their money to their collective organizations. The hasidics are a different breed; the women are sub species and their ways are cultish, IMO. Feel free to look up the definitions of the denominations or 'sects' as you put it."

241.   During the Board's hearings on the Yeshiva's application, Ocean Township residents regularly cheered and applauded statements made in their favor by Board members, speakers and the objectors' attorneys.

242.   Ocean Township residents booed the Yeshiva and its professionals.

243.   In response to the Board's ultimate denial of the Application, published comments by opponents to the Yeshiva included:

- "Keep them where they belong."

- "congratulations to the "objectors".. call it what u will but Lakewood is a dump and ocean township would be next.."

- "They won't stop there,...oh no,.. like a snarling pitbull, they will hold on to that idea and will prevail in the end,... don't forget, they have money, lots and lots of money to spend on town officials and they'll eventually get what they want...I've seen it happen in Teaneck,..same scenario, and look at Teaneck now."

- "Please NO! Look what became of Lakewood!!!"

- "They should take note, the residents of the town will fight you every step of the way. And if, by some twisted way of luck, you ever get this approved, we will protest in front of your school each and every day. Your lawyers say it

41

would be an inherent benefit...to whom? You would be tax exempt, you would truck in your food from lakewood and you want to confine your students to the school. You would contribute NOTHING to Ocean twp and buy none of our services."

- "Lakewood has already fallen off the edge of the cliff and is an utter dump without a tax base due to religious exemptions."

- "All the political correctness in the world cannot erase what Lakewood has become. Good, bad, indifferent, legal or not, PC or not - people in the area are well aware of Lakewood."

- "Woo we won for once! Stay in Lakewood we don't want our towns to look like trash"

- "This is a huge victory. Any time you let them have an inch, they take over the town while draining its resources."

- "I know for a fact that they have a sign that says in Hebrew... We took over Lakewood.. The world is next."

- "Hopefully they will lose wherever they try"

- "They just want to take over the WHOLE state of NJ!! Smh"

244.    Such intolerant and narrow-minded statements by Ocean Township residents have been made despite repeated warnings by opponents to not make such statements publicly, including the following:

- "We need to be careful what we say and post on this site. There is a leak among this group. They knew a few things that were only discussed here. If

someone is letting their lawyer read what we say, or discuss what we say in the group, then I believe you should remove yourself from our group."

- "That is why we need to especially be careful about what we say"

- "Religious discrimination will be an uphill fight for the applicant, UNLESS WE HAND IT TO THEM by making it a religious issue. The fact that a variance is required (because the dorm is a non-conforming use) works in our favor. Keep cool and don't blow it."

- "We would like to remind everyone that we MUST remain professional. If the application is denied chances are the decision will be appealed. We would not want it overturned due to poor behavior from opposed residents."

- "Suggestion, maybe have someone like yourself screening people who will ask questions by reminding them exactly what you have stated here? Idk if this would work or exactly how but I'd much rather have everyone informed that their question could very well be counter productive."

- "it's more about the 'stance' that we take."

- "We need to stick to the issues and have our voices heard at the meetings. I know that sucks, but it is the way it is."

245. Ocean Township residents have also policed the "No Dorm on Logan Road" Facebook page, deleting the more egregious comments. One leader of the opposition to the Yeshiva wrote:

> OK....I have deleted the article and thread that was being debated here today. If you saw it or were part of it, I apologize if you feel it should have stayed. If you didn't see it, I apologize but it needs to die here. While I truly HATE censorship......I must step in for the well being of this fight. OUR OPPOSITION HAS NOTHING TO

43

> DO WITH RELIGION. We need to be cautious how conversations
> and posts are perceived. Once something is said, it can not be taken
> back and it can be misconstrued to overturn a vote in an appeal. I
> will only speak for myself, and you may think me selfish, but I
> have personally invested a lot of time and effort in this battle and I
> am not willing to have anything damage our chances for a denial of
> this application.
>
> Please, I appreciate the research some are doing, but that research
> needs to focus on legitimate reasons for the Board of Adjustment
> Council to say NO. And that NO needs to be backed up in court
> when (and it is a when not an if) it is appealed.
>
> I do not want to change the group to administrators only being able
> to post, but if there are questionable posts in the future, I may have
> to change those settings.

246.   Such warnings demonstrate the well-known and exhibited nature of the community hostility to Orthodox Jews.

247.   Ocean Township residents also distributed the following email from a local realtor that contained, *inter alia*, the following false information: "This change would set a precedent to permit applications for not only additional colleges in all sections of Ocean Township but will allow other boarding homes, 24x7 clinics and halfway homes.  Our residential neighborhoods are not intended to host college dorms, boarding homes, or hotels, for 100+ people to live." Such statement indicates the hostility and animus towards the Yeshiva.

248.   The realtor's email falsely stated that the "dorm would house up to 122 men, . . . ."

249.   The realtor's email stated that the Yeshiva's use would create a "[d]ecrease in home values and increased taxes for public services," would raise an issue of "[s]afety of our public parks and playgrounds throughout the Township," and create "[n]oise, pollution, and storm water run-off . . . ."

44

250.    Such unreasonable scare tactics employed within the Ocean Township community further demonstrate residents' hostility to the Orthodox Jewish land use.

251.    An opponent of the Yeshiva stated: "It is clear that this is a very difficult process to try to derail and that we, as residents and neighbors truly have very little power other than to keep the pressure on so that the board remains motivated to find whatever grounds they can to deny it." Such statement indicates that any legitimate land use bases such as traffic and noise are pretextual reasons for the community opposition.

252.    While publicly Ocean Township residents have claimed that traffic is an issue, on the "No Dorm on Logan Road" Facebook page, residents made the following comments: "who the hell needed the traffic safety expert there?? What a huge waste of valuable time. That guy was pointless in relation to this application" and "All that did was waste time, . . . ."

253.    The Ocean Township community, motivated by the anti-Orthodox Jewish animus as described above, engaged in a concerted effort to "pack" the hearings, delay proceedings and even shut down Board meetings in an effort to drive away the Yeshiva.

254.    At the Board's meetings on October 23 and November 13, 2014, the Board only allotted 45 minutes each date for the Yeshiva's application.

255.    The Board began scheduling special meetings because of the number of Ocean Township residents that packed the December 11, 2014 Board hearing on the Application.

256.    According to the Director of Community Development, at the December 11, 2014 meeting there was a "[l]arge crowd with Fire Marshal in attendance.  Room capacity more than reached as some in audience are in hall."

257.    Ultimately, meetings could only be held in the Ocean Township High School

45

gymnasium, which is controlled by the Ocean Township Board of Education, and insufficient meetings were scheduled to hear the Yeshiva's application in a timely manner as described below.

258.    The Board stated that no other location was available to hear the Yeshiva's application.

259.    Only a very limited number of dates were made available to hear the Yeshiva's application.

260.    Ocean Township residents attempted to prevent the Application from being heard by packing the Board's special meetings beyond the facilities' capacity and by delaying proceedings on the Application.

261.    Various Ocean Township residents attempted to delay the proceedings by asking residents to "pack" the hearings.

262.    Former Board member Sylvia Silvia-Cioffi stated: "In the time I was on the BoA, this kind of opposition never came up."

263.    The Board's attorney stated: "As the hearings have progressed there has been an increase in the number of concerned citizens as to the proposed non-permitted use and most of the 1,000 plus persons attending the hearings are appearing *pro se*, with six (6) residents represented by counsel."

264.    An Ocean Township resident wrote on Facebook:

> I also tell people that you don't necessarily have to stay until the end. In my opinion, once you arrive, and your [sic] accounted for (the police officers use a clicker to tally attendance counts), you can always leave during a break in the action. . . . I bring my children with me and have them do homework, then my husband picks them up to go home.

265.    Ocean Township residents were able to prolong the testimony of the Yeshiva's sound expert, who testified on the audibility of students praying and studying to the nearest residence, over three hearings from July through October of 2015.  The testimony of the sound expert would have been continued to a fourth hearing had he been available on that date. Nothing else was accomplished on the Application during the period of his testimony.

266.    Another hearing on July 15, 2015 had to be cancelled as a result of the number of people attending.   More than 1,000 people attempted to attend the hearing in a 638-person auditorium.

267.    The transcript of July 15, 2015 hearing reads: "MR. STEINBERG: The fire marshal is here. We have maxed or possibly exceeded our capacity. (Public applause) . . . . MR. STEINBERG: Can I have your attention? Ladies and gentlemen, we have been advised by the fire marshal we have now -- please don't applaud -- we've exceeded capacity, okay. . . . MR. STEINBERG: Listen, we have no choice. It's for safety. Wait a second. Just be patient, please. We're going to adjourn the meeting and it will be officially adjourned shortly. The next meeting is scheduled for September 30, 2015, venue to be determined.  UNIDENTIFIED MEMBER OF THE PUBLIC: Meadowlands. (Applause)"

268.    At another point in the hearing, the transcript reads:  "CHAIRMAN GOODE: Meeting is adjourned.  (Public applause)"

269.    The applause at the cancellation of the hearing indicates the efforts of Ocean Township residents to delay the Yeshiva's application.

270.    The Yeshiva was still required to pay the Township $2,500 for the canceled hearing.

271.    After the July 15, 2015 hearing that was canceled because of overcrowding, and before the next hearing, an email was widely distributed to Ocean Township residents stating in part: "We need to <u>PACK THE ROOM</u>.  **AT LEAST 2000 PEOPLE WILL BE NEEDED TO DEMONSTRATE OUR OPPOSITION TO THIS CHANGE IN USE.**  Bring everyone including your kids . . . .   Attendance by all residents of Ocean Township is extremely important." This email was sent by a real estate agent.

272.    Another Ocean Township resident wrote on the "No Dorm on Logan Road" Facebook page: "Let's pack the school by bringing one more person each then [sic] you brought last time."

273.    After the July 15, 2015 hearing, Ocean Township residents made the following comments on the "No Dorm on Logan Road" Facebook page:

- "Applicant pays for any alternate venues!" "That makes it even sweeter!"

- "The applicant has to pay for everything! Renting the meeting room, expert witness, lawyers etc. Case in point the expert witness for noise has to come back and he will charge them for another appearance."

- "Dorothy it is better they adjourned it because it presents more inconvenience and displays the huge amount of opposition!"

- "[I]t will also cost the applicant thousands."

- "The more it costs them the better!"

- "If these guys want to go into their pocket for 10 grand at the college, that's ok by me. Smile emoticonsmile emoticon" "Me too…."

274.    Again, during the October 7 hearing, Ocean Township residents similarly

applauded the continuation of the application: "CHAIRMAN GOODE: So we're going to have to -- we're going to have to -- (Audience applause)  CHAIRMAN GOODE: We're going to carry this application to a date not certain; . . . ."

275.   After the Yeshiva's sound expert testified and responded to Ocean Township residents' questioning for three hearings and was required to come back for a fourth hearing, comments on the "No Dorm on Logan Road" included "We have a month to prepare more questions.  The sound guy has to come back also." And "It's kinda funny.  They have to pay him to come back for a few questions."

276.   Other statements by Ocean Township residents included:

- "Let's stay focused and most important we need every seat taking at the next meeting. Standing room only."

- "They didn't vote tonight. Got put off until next month. It's a good thing. Gives us more time to gather information and to get more people to show up."

- "This is a reminder of the meeting at the high school tonight. 7 pm. No Dorm on Logan. Let's pack the room. Please share"

- "We are looking for thousands of attendees, not just hundreds."

- "[W]e need to PACK THE ROOM!! EVERY.SINGLE.TIME!"

277.   Members of the Ocean Township Board of Education exhibited animus toward the Yeshiva and its application.

278.   Members of the Ocean Township Board of Education conspired with Ocean Township residents to prevent the gymnasium from being made available for the Yeshiva's application hearings.

49

279.    Members of the Ocean Township Board of Education engaged in communications with Ocean Township residents on private Facebook pages discussing their effort to prevent the Yeshiva from locating in the Township.

280.    After the Board's denial of the Yeshiva's application, Board of Education member Bob Angelini posted on Facebook: "This isn't nearly over.  Let's not let our guard down.  They will surely appeal and the testimony and meetings will continue."

281.    The following image was distributed on Facebook among opponents to the Yeshiva, with the attached comment: "Morning folks! Please don't forget there is a Board of Adjustment meeting tonight at the HS. The application for the dorm on Logan Rd. is being discussed. This is a bad use for OT and should not be permitted. 5 years ago this type of application came to Deal Rd. It was never brought to vote. The applicant simply removed the application because of the tremendous opposition."



Board of Adjustment Special Meeting
Monday, May 18, 2015 at 7:00 pm
Township of Ocean High School Auditorium
550 West Park Avenue
LET'S PACK THE ROOM!
No Dorm on Logan Road

282.    The Facebook post described above, among others, was "liked" by Ocean Township Board of Education member Michael Palutis.

283.    On September 23, 2015, an email was distributed among Ocean Township residents stating in part: "We would like everyone to wear RED to show our unity and support for Ocean."

284.    The following image was distributed on Facebook among opponents to the

Yeshiva:



285. Through a combination of the Board's failure to control lengthy, repetitive and irrelevant questioning of witnesses, its failure to hold hearings of sufficient length and frequency, its own focus on issues not germane to the use variance application, and Ocean Township residents' concerted effort to delay the proceedings, the Board of Adjustment took more than four times the statutory period to issue a denial of the use variance "without prejudice."

286. The Board had previously informed the Yeshiva that its Resolution of denial would be adopted by the Board at its meeting on December 10, 2015.

287. The Board canceled its December 10, 2015 meeting, and therefore the Resolution was not adopted until January 6, 2016.

288. This delay threatens the ability of the Yeshiva to have any facility in which to

51

operate its school for the 2016-2017 academic year.

289.    The cost to the Yeshiva to attend each hearing is approximately $15,000+, which includes the facilities fee charged by the Township to the Yeshiva, the cost of its experts and attorneys, and the cost of court reporters.

290.    The Township has also charged the Yeshiva $10,500 as of November 24, 2015 to pay the Township's own planner, engineer and attorney.

291.    After 474 days and eight hearings, on November 16, 2015 the Yeshiva requested that the Board provide dates to complete the application prior to the end of 2015.

292.    The Board's attorney informed the Yeshiva that no dates after December 1 would be made available in 2015.

293.    The Board informed the Yeshiva that dates in January or February "might" be made available, but did not commit to any.

294.    The Yeshiva also requested that the Board extend its hearings past the 10:00pm ending time that it had set.

295.    New Jersey courts have held that zoning boards could extend board meetings past midnight.

296.    The Board refused to extend its hearings past midnight.

297.    The Board's attorney stated: "Since there is no likelihood of concluding the hearings given the number of professionals proposed by the attorney for the six (6) Objectors he represents and the significant number of other Objectors appearing *pro se* who need to be given an opportunity to address the Board, the use of the facility for a few more hours is unjustifiable."

298.    The Board has refused to hear the Yeshiva's application during its regular Board

meetings.

299.   At the December 1, 2015 hearing, the Yeshiva asked the Board whether it could commit to a date by which the application would be voted on.

300.   The Board provided no date in response to the Yeshiva's question as to whether the Board could commit to a date by which the application would be acted upon.

301.   At the December 1, 2015 hearing the Yeshiva requested that residents be limited to five minutes in their questioning of the Yeshiva's witnesses and for testimony.

302.   New Jersey courts have held that a five minute limit for such questioning was a reasonable limitation that could be enforced by a Board.

303.   The Board refused to limit residents' questioning to five minutes, stating that such a limitation would be "not fair."

304.   The objectors' attorney had stated that he intended to present four or five expert witnesses and that there have been approximately 900 to 1500 residents at the past three meetings.

305.   The objectors' attorney has also demanded multiple opportunities to cross-examine the Applicants' witnesses, delaying the hearings further.

306.   The objectors' attorney also opposed the Yeshiva's effort to bifurcate the application and to hear the use variance application first, which is the applicants' right under New Jersey law.

307.   A site plan application involves a lengthy and detailed review of engineering, architectural, environmental and other issues that would be unnecessary if the use variance was denied.

308.     The opposition by the objectors' attorney to the bifurcation was intended to further delay the proceedings.

309.     Given the attendance of 1,000 plus individuals per hearing, the lack of any meaningful limitation on their examination of witnesses and testimony, the limitation of three hour hearings, the inability to schedule more than one hearing per 61 days on average, and the lengthy case that the objectors' attorney planned to present, the application will likely take at least one and a half to two more years to complete.

310.     The Board's attorney stated: "The counsel representing the six (6) Objectors, as well as the multitude of concerned citizens appearing *pro se* are entitled to a reasonable time period in which to present their case in opposition, which does not seem to be feasible in this instance if the Applicant does not grant additional time."

311.     During the Board's hearings, the Board members often asked, or permitted members of the public to ask, irrelevant questions that are outside of the scope of a use variance application.  Upon information and belief, the Board has not raised such issues with respect to other use variance applications.  These included whether the Yeshiva would provide a financial benefit to the Township; whether there would be licensed healthcare professionals on staff; and questioned the Yeshiva's witnesses on dumpsters and refuse pick-up in the context of the use variance application, when any school or other permitted use would also require such services.

312.     Board member Napolitani argued that the laws of physics were not relevant to the issue of how much sound would be created by the voices of rabbinical students: "COMMISSIONER NAPOLITANI: Now, Mr. Chairman, just to piggyback off of what Ms. Bonney was saying: I teach in a middle school; there is no way that 50 more people make 3

decibels of sound level.  (Audience applause.) . . . . THE WITNESS: My only response would be it's a matter of physics. And if you were to open up a textbook on acoustics, the arithmetic, or the addition of sound, in terms of decibels, you would see this in black and white. So this is not a – an opinion, this is a matter of physics. COMMISSIONER NAPOLITANI: We're not talking a matter of physics here, we're talking somebody's house next door."

313.    Mr. Napolitani's irrational statement, resulting in applause from Ocean Township residents, demonstrates clear hostility and bias against the Yeshiva.

314.    Ocean Township residents often failed to restrict their statements to questioning of the witnesses, instead attempting to improperly testify themselves throughout the hearings.

315.    Ocean Township residents that lived several miles away from the Property complained about the sound of rabbinical students praying and studying.

316.    Individuals focused on the irrelevant death of a student at a different school nearly thirty years ago.

317.    The following are examples of questions posed to the Yeshiva's witnesses that were wholly unrelated to the land use issues presented:

- "Mr. Lesin, in 1986 you had a tragic situation occur up in Long Island, very sad. So my question is, with that situation, will you follow the laws set forth by the Constitution of the United States, the State of New Jersey, the County of Monmouth, the Township of Ocean or will you use your own religious laws?"

- "My concern would be what about medical emergencies? Do you have a medical doctor, nurse on staff at all times for 96 men that will be not doing

recreational things but are just normal human beings?"

- "Okay. Are there young men within your community who smoke cigarettes?"

- "Your resume indicated that you did acoustical studies in Manalapin Township versus Raceway Park. Why was the acoustical study done? MS. KRIMKO: I have to object. It's not relevant."

- "Can you tell me what a blind study is? MR. SZULECKI: Well, a blind study's generally associated with -- as -- in my mind -- . . . . MR. SZULECKI: The concept of a blind study, in my mind, I think of drug trials, where there's a need for differentiating statistically between significant outcomes and insignificant outcomes, and so -- [RESIDENT]: It's part of the scientific method of collecting data, would you say? MR. SZULECKI: No, I wouldn't say. I would say it's a technique that can be used -- [RESIDENT]: What is the benefit -- what is the benefit of a blind study?"

- "Okay. any idea what decibel a fire truck is?"

- "My question for you, sir, is back to the horrific and violent death of Mr. Weiss [in the 1980s in New York]. We've already established that you cooperated with the police department. However, and I have a quote right here and I can give you the source, Ms. Krimko, if you'd like it from Lieutenant Nolan of the Nassau County Police Department."

- "Rabbi, how is your school funded?"

- "I just have another question on the tuition. You stated for the school to operate you'll be having donations and tuition, just like a normal, you know,

secular school would be and the students would pay that. I haven't heard anything about a payment in lieu of taxes."

- "What are the admission requirements for the students? How do they get accepted? What kind of education, background?"

- "So what is the benefit to the town if your students are not allowed to leave and spend money in local shops and businesses if they are not allowed to leave the campus?"

318.   The following are examples of repetitive questioning by Ocean Township residents:

- "[RESIDENT]: The measuring device that you used, when was that calibrated?  THE WITNESS: They're -- both instruments were within their yearly laboratory calibration periods, and so was the field calibration device that was used to calibrate in the field -- check calibration on the instruments both before and after the measurement sessions." and, at the next hearing: "[RESIDENT]: Oh, I apologize. Was it -- when's the -- what's the record of last calibration of that equipment?  MR. SZULECKI: That was testified to at the last hearing."

- "MS. KRIMKO: Okay. And, again, what I did was I said as the Rabbi testified to at previous hearings -- [RESIDENT]: I wasn't there.  MR. STEINBERG: The record is available.  MS. KRIMKO: I understand, but the applicant doesn't have the burden of having their witnesses repeat testimony continually for the benefit of those public who weren't there. There's tapes --

[RESIDENT]: We don't have time because we work so we could pay our taxes. MS. KRIMKO: There's tapes available -- (Public applause)"

- [RESIDENT]: Why didn't you perform a blind study? MR. STEINBERG: Okay. MR. SZULECKI: I -- for a number of reasons, and some of those -- many of those I went over last week, but I'll be happy to do that again if you'd like. . . ."

- "[RESIDENT]: Why didn't you send someone down to collect the information that didn't have an expectation of the outcome? Why didn't you blind the data collection, so that person would not be biased? MR. SZULECKI: I answered that already, why it wouldn't make sense to do this without --"

- [RESIDENT]: . . . . Would it be fair to say that the conclusions that you reached regarding the acoustical impact of the prayer service on the exterior of the building, which you have said are nonexistent, basically, are contingent upon what you observed being a representative prayer service? MR. SZULECKI: This is all information I've testified to, that -- [RESIDENT]: It's a simple -- all you have to say is yes or no. I mean, we don't have to have this conversation. [RESIDENT]: Okay. Did you also testify that, prior to going to observe this prayer service, you had never before seen any similar prayer service? MR. SZULECKI: It's all been discussed in testimony."

319.   Such irrelevant and repetitive questioning served to delay the application proceedings further.

320.   Ocean Township residents exhibited significant hostility toward Rabbi Shlomo

Lesin, who testified on behalf of the Yeshiva.

321.    The acting Board Chairman was forced at one point to state:

> CHAIRMAN VAN WAGNER: And I know that this is -- there's a
> lot of people, but honestly, I just want us to be respectful of every
> application that comes before us. We don't honestly typically, and
> we sit up here 15 at least times a year, allow for everybody to laugh
> every time a witness does not answer the question the way we want
> it to be answered.

322.    Ocean Township residents exhibited significant hostility and animus toward the

Yeshiva, students of the Yeshiva, and the Jewish faith, making statements such as:

- "So we don't know if we're bringing in a convicted criminal by chance, by
  chance, sex offender, anything like that? Okay."

- "No wonder they can't leave their dorms for 10 hours at a time. They need to
  study hard on how to screw an entire town and get away with it. It's not a
  religious school, it's a business school. It's sickening."

- "What will they bring to the community? . . . . Nothing."

- "Many residents are opposed to this application with concerns ranging from
  the following . . . . 100+ men wandering our streets."

- "I'm wondering is that lawn area -- because they're 18 and they can buy
  cigarettes and I would think that with 90 men smoking cigarettes, that would
  be a huge disturbance to the neighbors that have their windows open. As you
  all know, smoke travels and it's disgusting if you're not a smoker. So I'm
  wondering if there's no tables and they can't sit there, will they still be able to
  stand there and smoke cigarettes or will they still be crossing the street and
  smoking at the park around our children?  (Public applause)"

59

- "Okay. Did you, at any time, think it would have been appropriate for you to try to determine whether what you actually witnessed was a representative prayer service?   MR. SZULECKI: And I did do that through my discussions with the client, through some reading as to -- (Audience laughter)"

- "They will not care about the Town only the land to develop on Tax Free of course which means everyone's taxes will increase but the most important thing is it will not be conducive to a friendly neighborhood but just my opinion from past experience."

- "Most residents can't visit attend or pray there. How is that a benefit? AND the men are not permitted to integrate into our community."

- "This community is exempt from contributing to the tax base because of religious exemptions and they as a community remain insular and non-participatory. They want financial support and community support yet offer nothing in return."

- "[N]o religious/cultural/philosophical benefit to the community."

- "So what is the benefit to the town if your students are not allowed to leave and spend money in local shops and businesses if they are not allowed to leave the campus?"

- "Okay. Is there any --where would the religious artifacts be disposed? Religious artifacts, is there a separate can for those?  [RESIDENT]: Off site. How will they be transported off site?   MS. KRIMKO: If the Board has concerns about religious artifacts, which I don't know that are necessarily

appropriate here -- UNIDENTIFIED MEMBER OF PUBLIC: The residents do."

- "[W]ill they be performing any type of community service within the town of Ocean Township, our town, Wanamassa, Wayside, Oakhurst, as part of their curriculum?"

- "I mean, if they're not permitted to leave the site, I mean, is it like a correctional facility? I'm just curious. I mean, I'm being serious."

- "The question for the noise consultant is what is the dBa of the loud piercing clarion call of the Shofar."  (A Shofar is a musical instrument used for Jewish religious purposes.)

- "Sounds like a fun school: no sports, cellphones, movies or television, dating or alcohol and drugs."

- "[I]t concerns us to have a dorm for 100 socially-isolated grown men . . . ."

323.    Ocean Township residents often made contradictory statements demonstrating that no yeshiva would be welcome, which reveals their hostility and animus against the yeshiva. These included:

- Statements demonstrating both that residents did not want Yeshiva students walking through their communities but that there was no benefit to the Township if they were not allowed to leave the campus;

- Complaints about additional concrete creating runoff, but when realizing that impervious surface will be reduced, complaining that green space will require fertilizer, which will create runoff; and

- Statements that recreational activities of the students would disturb the residents, but criticizing the Yeshiva for not providing recreational opportunities for the students.

324.   The hostility of Ocean Township residents even extended toward Township officials on occasion if they were not seen as sufficiently hostile to the Yeshiva.   Examples include:

- "Can I ask what your name is?  MR. STEINBERG: Mark Steinberg. I'm the Board Attorney.   [RESIDENT]: The Board Attorney, representing?  MR. STEINBERG: The Board.  MR. McNALLY: The Board. I didn't pick up on that. I don't know if anyone else did. You don't seem to be doing a very good job."

- "(Public applause)   CHAIRMAN GOODE: All right, now that we got that over with, please stop acting like children and pay attention to what's going on.   UNIDENTIFIED MEMBER OF THE PUBLIC: You pay attention. CHAIRMAN GOODE: It's enough. It's enough. Be respectful."

- "If the board is not as aggressive as they should be, in terms of the town's best interest, then how can they be removed? At that point it is the responsibility of the mayor correct?  If any of these issues aren't resolved then these members need to go."

- "Can the Board vote against it just because they know the residents are opposed? Or are they like a judge who has to rule in favor of 'the law'. If the latter is the case we have a big problem"

325.    As stated above, under New Jersey law, a complete application for a use variance must be decided within 120 days by the Board.

326.    The Board's own rules state: "The decision of the Board, upon the submission of a complete application, shall be made as follows: . . . . for variance approval: 120 days."

327.    The New Jersey Supreme Court has held: "We presume that boards act in good faith. However, they must also act within the statutory timetables. When the application is deemed complete, the clock begins to run. Where a board fails to act within the statutory limits, even for what it considers "good" reasons, the statute is violated and automatic approval comes into play."

328.    The New Jersey Supreme Court held that the only exception from the requirement that a use variance application must be decided without 120 days is if the delay was "inadvertent" or "unintentional," otherwise the applicant is entitled to an automatic approval of the use variance.

329.    The failure to decide the Yeshiva's application within 120 days was neither inadvertent nor unintentional.

330.    Failure to hear testimony from objectors is not an exception to the statutory timetable.

331.    The Yeshiva has been extremely patient with the length of time that has passed since the application was filed, and has consented to many extensions of time, despite the delay tactics of the Ocean Township community and failure by the Board to hold hearings of sufficient frequency and length.

332.    The Yeshiva has repeatedly consented to extensions of time, including on the

following dates: October 23, 2014 consent to an extension of time to November 13, 2014; November 13, 2014 consent to an extension of time to December 11, 2014; December 11, 2014 consent to an extension of time to January 8, 2014; December 23, 2014 consent to an extension of time to February 24, 2015; February 24, 2015 consent to an extension of time to March 12, 2015; March 4, 2015 consent to an extension of time to May 18, 2015; May 18, 2015 consent to an extension of time to June 3, 2015; May 29, 2015 consent to an extension of time to July 15, 2015; July 16, 2015 consent to an extension of time to September 30, 2015; September 30, 2015 consent to an extension of time to October 7, 2015; October 7, 2015 consent to an extension of time to November 24, 2015; and November 3, 2015 consent to an extension of time to December 1, 2015.

333. Because of the termination of its lease and need to perform certain renovations and obtain site plan approval for the Property, the Yeshiva was unable to consent to further extensions.

334. On November 16, 2015, the Yeshiva informed the Board that it would not be able to consent to further extensions of time after December 1, 2015.

335. The Yeshiva also informed the Board that it was willing to continue the hearing into the night until complete.

336. On November 25, 2015, the Yeshiva informed the Board that it was willing to continue the Application for another month, until December 2015, providing the Board with additional opportunity to conclude the matter.

337. The Board was unwilling to schedule further additional hearings or longer hearings to conclude the matter prior to the end of the year.

338.    On December 1, 2015, given both the purposeful delay tactics of the community opposition motivated by anti-Orthodox Jewish animus, and the refusal of the Board to set a reasonable schedule for review of the application, the Yeshiva was no longer able to consent to further extensions of time.

339.    The Board's attorney advised the Board that failure to render a decision would likely result in an automatic approval of the application.

340.    The Board's attorney "advised [the Board] to deny the application, without prejudice, which would allow the Applicant returned [sic] to the Board or continue hearings in the future in a higher authority remanded the matter back to the Board."

341.    The use variance was denied on December 1, 2015, which was 511 days after the Application was complete.

342.    In its Resolution, the Board stated that it was only making "limited findings of facts."

343.    The Board described the number of people opposed to the Yeshiva as "voluminous."

344.    The Board stated that those opposed to the Yeshiva "did not have sufficient time to either present expert testimony in opposition or inform the Board of their concerns and objections, . . . ."

345.    The Board's findings of fact regarding the proposed use are generally consistent with the Applicant's proposed use.

346.    The Board noted that the Rabbi testified that there would be a "strict code of conduct required of all students who would not use the outdoor facility of the site, the area

65

around same, nor would any student smoke or bring a car to the campus, with the violation of such rules causing immediate termination of any student."

347.    The Board correctly noted that "[m]uch cross examination of the Rabbi questioned the credibility of the actual way the students would conduct themselves as well as the enforcement of any consequences for violation of said rules . . . ."

348.    The Board noted that the opposed "citizens questioned both the Rabbi and the Professional Planner as to the negative criteria, since there was no proof that the operation as proposed by the Rabbi would run the way he intends it to run and there is no proof that 18 to 22 year old men can legally be bound to the rules established by the Talmudic Academy . . . ."

349.    Such cross examination by Township residents was motivated by hostility toward the Yeshiva's religious faith.

350.    Upon information and belief, other non-Orthodox Jewish applicants for use variances in Ocean Township were not subjected to such cross-examination.

351.    The Yeshiva can enforce its rules through disciplinary action and expulsion of students.

352.    The Board noted the testimony of the Yeshiva's architect, who stated that "the design of the building meet[s] the requirements of the Rabbi for this type of school and the dorm rooms were of sufficient size per code for four students in each."

353.    The Board found that the site plan "would improve the drive aisle in front of the building by eliminating same and relocating the dumpster to an area less offensive to the neighboring residential property to the north."

354.    The Board noted the testimony of the Yeshiva's sound engineer who determined

66

that "no sound would be emanating from the building to be heard by adjacent property owners and the Applicant agreed to condition any approval on elimination of open windows, replacing doors and other sound attenuating items as required by the Board."

355.     The stated basis for the Board's denial was that "the Board does not find that the Applicant established special reasons cognizable by the Board of Adjustment of the Township of Ocean," and that "the granting of a use variance for the use as proposed would cause substantial detriment to the public good and would substantially impair the intent and purposes of the Zoning Ordinance or the Zoning Plan."

356.     The Board stated that it denied the application "for failure to have sufficient time to hear both the professional and lay testimony of the Objectors, so the Board can properly weigh the benefits and detriments of the application and render a reasoned decision."

357.     The Board also stated that it "is unable to find the benefits of granting the use variance or if same are or are not outweighed by the detriments, due to the inability to be presented with any testimony by way of either or both lay and professional witnesses on behalf of the numerous concerned citizens in opposition."

358.     The Board's denial of the Yeshiva's application therefore resulted directly from community hostility and delay tactics motivated by anti-Orthodox Jewish animus.

359.     The Ocean Township residents' reaction to the Board's denial was described as "thunderous applause."

360.     The Board's Resolution denying the use variance was adopted on January 6, 2016.

361.     The Board stated that the denial was "without prejudice."

67

362.    The Board's denial of the use variance was arbitrary and capricious as it was in violation of New Jersey law.

363.    The Board's position that it could deny an application "without prejudice" regardless of extensive delays pushing an application far beyond the statutory deadline is contrary to state law, as it would effectively negate N.J.S.A. 40:55D-73.a, as any Board (like this Board) could simply delay proceedings indefinitely without issuing a meaningful decision.

### Other Yeshiva Applications
### in Ocean Township

364.    In 2010, a previous application was made for a boarding yeshiva by Beth Medrash of Asbury Park at the Property.

365.    Similar opposition was raised by the community against that use.

366.    The opposition to that proposed use was driven mainly by hostility toward students of Orthodox Jewish education uses.

367.    Ultimately, the Beth Medrash of Asbury Park decided that it could not fight the community hostility and withdrew its application.

368.    Also in 2010, an application for a use variance was filed by the Yeshiva of Ocean at a different location, 1001 Deal Road, and was met with similar community resistance.

369.    Organized opposition was raised against the Yeshiva of Ocean's proposed use.

370.    The Yeshiva of Ocean's application was for an even smaller *yeshiva gedola* constituted of approximately 60 students.

371.    During the hearing for the Yeshiva of Ocean's application, Board members asked "where the students come from" and questioned the lack of a set curriculum.

372.    Opposition to the Yeshiva of Ocean was similar to this Yeshiva's application. Many Ocean Township residents distributed a letter describing their opposition to the Yeshiva of Ocean containing statements such as "No criminal or sexual predator background checks are performed on these men whatsoever," "Miller's residents come and go without any registration," and stating that the proposed use will create "noise, filth and decay."

373.    At the hearing on the Yeshiva of Ocean's application, Ocean Township residents asked irrelevant questions such as how the Yeshiva was funded, its past location, and why degrees were not offered.

374.    Ultimately, the Yeshiva of Ocean abandoned its application because of local community opposition.

375.    Regarding the Yeshiva of Ocean application, a former member of the Board of Adjustment stated:

> [W]e organized the neighborhood. They held a number of long meetings. . . . It really invigorated our determination. The attorney (same woman) called us the day after one of the more vocal meetings and said the applicant wanted to compromise. They were willing to accommodate our concerns. We told her no compromise was acceptable and they could expect more of the same at the next meeting. Within a couple of days, they pulled the application. Then we asked that the [Township] council proactively prevent this kind of application from coming forward again. We were told it would definitely be addressed and something would be done."

(Emphasis added.)

376.    This pattern of organized opposition to yeshiva applications demonstrates significant hostility against Orthodox Jewish land uses by Ocean Township residents.

377.    A lead objector, Paul Mayerowitz, stated: "The opposition of the community to this application is overwhelming apparent. What is not quite apparent is why the applicant has

not withdrawn their application as was done with one in Freehold. There the applicant withdrew because he did not want to put a Yeshiva dormitory in a place where neighbors did not want it."

378.    Upon information and belief, the Board and Township have approved other development projects in the Township with greater land use impacts.

379.    Upon information and belief, less opposition has been raised by Ocean Township residents with respect to other development projects in the Township with greater land use impacts.

380.    Upon information and belief, no application for development in Ocean Township has created more community opposition than those for Orthodox Jewish yeshivas.

381.    There is no rational basis to prohibit a *yeshiva gedola* entirely from Ocean Township.

382.    There is no rational basis to prohibit dormitories for a *yeshiva gedola* entirely from Ocean Township.

383.    There is no rational basis to prohibit the Yeshiva from operating on the Property.

384.    The Board's denial of the Yeshiva's use variance severely impedes and prevents the Yeshiva's exercise of its religion.

385.    The Defendants' laws and actions have rendered the Yeshiva's religious exercise effectively impracticable.

386.    The renovation of the Yeshiva's proposed *yeshiva gedola*, at an estimated cost of $700,000, would affect interstate commerce. The construction's effect on interstate commerce would result from, amongst other things, the Yeshiva's fundraising activities related to the renovation; the transfer of funds to those it engages to renovate the *yeshiva gedola*; the

70

engagement of construction companies to renovate the *yeshiva gedola*; the employment of and payments to construction workers either by the Yeshiva or by companies engaged by it; the purchase of necessary materials to renovate the *yeshiva gedola*; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to renovate the *yeshiva gedola*; the use of interstate communication related to the renovation of the *yeshiva gedola*; and other activities related to the renovation of the *yeshiva gedola*.

387.   The operation subsequent to the *yeshiva gedola's* renovation would affect interstate commerce.  The Yeshiva's operation would affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New Jersey; the use of means of interstate communication to facilitate the *yeshiva gedola's* ongoing operations; the use of interstate travel related to the *yeshiva gedola's* ongoing operations; the employment of any part-time or full-time employees; and the purchase of goods and services related to the *yeshiva gedola's* ongoing operations and maintenance.

388.   The Defendants' actions described above all took place under color of state law.

389.   The Board was informed of the applicability of RLUIPA to its actions.

390.   The harm to the Yeshiva caused by the Defendants' laws and actions, which prevent it from using the Property as a *yeshiva gedola* to accommodate its religious needs, is immediate and severe.

391.   Defendants' laws and actions imminently threaten to substantially burden the Yeshiva's free exercise of religion.

392.   There are no quick, reliable and viable alternative options for the Yeshiva's

operations.

393.    The Yeshiva has no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

394.    The Plaintiffs have also suffered significant financial damages as a result of the Defendants' laws and their application to the Yeshiva, such as costs related to the use variance application (including extraordinary expenditures not required of similarly situated applicants), preventing the Yeshiva from receiving revenues, required additional expenditures to operate at an alternative location, and increases in construction costs resulting from delay.


### COUNT I

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Substantial Burdens"
42 U.S.C. § 2000cc(a)**

395.    Paragraphs 1 through 394 are incorporated by reference as if set forth fully herein.

396.    Defendants have deprived and continue to deprive the Yeshiva of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that places substantial burden on the Yeshiva's religious exercise without using the least restrictive means of achieving a compelling governmental interest.


### COUNT II

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Nondiscrimination"
42 U.S.C. § 2000cc(b)(2)**

397.    Paragraphs 1 through 396 are incorporated by reference as if set forth fully herein.

398.   Defendants have deprived and continue to deprive the Yeshiva of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that discriminates against the Yeshiva on the basis of religion and religious denomination.

## COUNT III

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Exclusion and Limits": Total Exclusion
42 U.S.C. § 2000cc(b)(3)(A)**

399.   Paragraphs 1 through 398 are incorporated by reference as if set forth fully herein.

400.   Defendants have deprived and continue to deprive the Yeshiva of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that totally excludes it from within their jurisdiction.

## COUNT IV

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Exclusion and Limits": Unreasonable Limitation
42 U.S.C. § 2000cc(b)(3)(B)**

401.   Paragraphs 1 through 400 are incorporated by reference as if set forth fully herein.

402.   Defendants have deprived and continue to deprive the Yeshiva of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations in a manner that unreasonably limits religious assemblies, institutions, and structures within their jurisdiction.

73

## COUNT V

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 — "Equal terms"
### 42 U.S.C. § 2000cc(b)(1)

403.    Paragraphs 1 through 402 are incorporated by reference as if fully set forth herein.

404.    Defendants have deprived and continue to deprive the Yeshiva of its right to the free exercise of religion, as secured by RLUIPA, by treating the Yeshiva on terms that are less than equal to nonreligious assembly and institutional land uses.

## COUNT VI

### United States Constitution
### 42 U.S.C. § 1983: First Amendment
### Free Exercise of Religion

405.    Paragraphs 1 through 404 are incorporated by reference as if set forth fully herein.

406.    Defendants have deprived and continue to deprive the Yeshiva of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by substantially burdening the Yeshiva's religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against the Yeshiva on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

## COUNT VII

### United States Constitution
### 42 U.S.C. § 1983: Fourteenth Amendment
### Equal Protection

407.    Paragraphs 1 through 406 are incorporated by reference as if set forth fully herein.

408.   Defendants have deprived and continue to deprive the Yeshiva of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against it in the imposition and implementation of their land use regulations.

## COUNT VIII

### Fair Housing Act
### 42 U.S.C. § 3604

409.   Paragraphs 1 through 408 are incorporated by reference as if set forth fully herein.

410.   The Defendants have intentionally discriminated against the Plaintiffs by making housing "unavailable" within Ocean Township because of religion in violation of 42 U.S.C. § 3604(a).

411.   Defendants' land use regulations have had the effect and continue to have the effect, whether intended or not, of excluding Plaintiffs from obtaining housing anywhere within Ocean Township by discriminating against the Plaintiffs based on religion, in violation of 42 U.S.C. § 3604(a).

412.   Plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

## COUNT IX

### The Board's decision denying the use variance without prejudice
### was arbitrary, capricious and unreasonable

413.   Paragraphs 1 through 412 are incorporated by reference as if set forth fully herein.

414.    Plaintiffs satisfied their burden of proof on the use variance requests and such relief should have been granted.

415.    The Court should decide all remaining issues unresolved by the Board because remand will likely subject Plaintiffs to further protracted hearings at huge expense; will result in the consideration of more unqualified, anecdotal comments by the public; and will result in the rejection by the Board of the balance of Plaintiffs' application.


## COUNT X

### New Jersey Common Law
### *Sica v. Bd. of Adjustment of Twp. of Wall*

416.    Paragraphs 1 through 415 are incorporated by reference as if set forth fully herein.

417.    The Board failed to comply with the requirements in Sica v. Board of Adjustment of the Twp. of Wall, 127 N.J. 152 (1992), in that the Board failed to impose conditions to alleviate any perceived detriments which would flow from the grant of the requested use variance, including the conditions agreed to by the Yeshiva during the course of the many public hearings.


## COUNT XI

### New Jersey Law Against Discrimination,
### N.J. Stat. Ann. § 10:5-12.5

418.    Paragraphs 1 through 417 are incorporated by reference as if set forth fully herein.

419.    By denying Plaintiff Yeshiva, on the basis of religion, the opportunity to obtain the accommodations, advantages, facilities, and privileges of ownership of real property,

Defendants violated and continue to violate Plaintiff Yeshiva's rights under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*

420.    Defendants' conduct has caused significant damage to Plaintiffs.

421.    Defendants are liable for the damage caused to Plaintiffs, and should be enjoined from further violating Plaintiffs' rights.

## PRAYER FOR RELIEF

WHEREFORE, the YESHIVA GEDOLA NA'OS YAAKOV, INC. and ZEBRA HOLDINGS II LLC respectfully requests that this Court grant the following relief:

1.    A declaration that Ocean Township's land use ordinances, to the extent that they substantially burden, exclude, unreasonably regulate, and discriminate against the Yeshiva's land use, are void, invalid and unconstitutional on their face and as applied to the Yeshiva on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination;

2.    A declaration that the denial of the Yeshiva's use variance application is void, invalid and unconstitutional on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination;

3.    An order reversing the decision of the Ocean Township Zoning Board of Adjustment and an order declaring that the Yeshiva's application to use the subject property as a *yeshiva gedola* is hereby approved;

4.    An order directing the Ocean Township Zoning Board of Adjustment to reverse its denial of the use variance and grant the Yeshiva such use variance necessary to construct its *yeshiva gedola* on the Property as applied for;

5.    An order enjoining the Defendants, their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates the Free Exercise Clause of the First Amendment to the United States

Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination, or undertaking any and all action in furtherance of these acts, and specifically enjoining the Defendants to approve all plans and applications submitted by the Yeshiva in furtherance of its development of the Property without delay or unreasonable condition;

6.    An award of compensatory damages against Defendants in favor of the Plaintiffs as the Court deems just for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, and the Religious Land Use and Institutionalized Persons Act, the Fair Housing Act, and the New Jersey Law Against Discrimination incurred by the Yeshiva and caused by the Defendants' laws and actions;

7.    An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

8.    Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted by the Plaintiffs this 8th day of January, 2016.

WILENTZ, GOLDMAN & SPITZER, P.A.

By: _____
Donna M. Jennings (DJ7790)
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
Tel: 732.855.6039
Fax: 732.726.6560
djennings@wilentz.com

STORZER & GREENE, P.L.L.C.
Roman P. Storzer
*Application for admission pro hac vice pending*
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996
storzer@storzerandgreene.com
*Attorneys for Plaintiffs*

78

## CERTIFICATION

Pursuant to R. 4:69-4 of the New Jersey Court Rules, I hereby certify that all transcripts have been ordered and will be filed with the court after the matter has been assigned a judge for total handling.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiffs

By: _____
DONNA M. JENNINGS (DJ7790)

## DEMAND FOR JURY

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action on all issues so triable.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiffs

By: _____
DONNA M. JENNINGS (DJ7790)

## CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that this matter is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time. I do not know of any other party who should be joined in this action.

WILENTZ, GOLDMAN & SPITZER, P.A.
Attorneys for Plaintiffs

By: _____
DONNA M. JENNINGS (DJ7790)