## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

YESHIVA GEDOLA NA'OS YAAKOV, INC., a New Jersey nonprofit corporation, and ZEBRA HOLDINGS II LLC, a New Jersey Limited Liability Company,

        Plaintiffs,

vs.

TOWNSHIP OF OCEAN, N.J. and ZONING BOARD OF ADJUSTMENT OF THE TOWNSHIP OF OCEAN,

        Defendants.

Civ. No. 3:16-00096 (FLW) (DEA)

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

WILENTZ, GOLDMAN & SPITZER, P.A.
Donna M. Jennings, Esq.
90 Woodbridge Center Drive, Suite 900
Woodbridge, New Jersey 07095
Tel: 732.855.6039
Fax: 732.726.6560
djennings@wilentz.com
*Attorneys for Plaintiffs*

STORZER & GREENE, P.L.L.C.
Roman P. Storzer, Esq.
1025 Connecticut Ave., NW #1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996
storzer@storzerandgreene.com
*Admitted pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

PRELIMINARY STATEMENT ........................................................1

STATEMENT OF FACTS ................................................................5

    I.       The Yeshiva's Religious School and Need for a Facility. ....................5

    II.      The Subject Property. ........................................................6

    III.    The Township's Land Use Regulations .............................8

    IV.    The Yeshiva's Application for Use Variance. ..................12

STANDARD OF REVIEW ..............................................................21

ARGUMENT ....................................................................................22

    I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .........23

        A.    The Yeshiva is Likely to Succeed on its "Total Exclusion" Claim. ........................................................26

        B.    The Yeshiva is Likely to Succeed on its "Unreasonable Limitations" Claim. ......................................................27

        C.    The Yeshiva is Likely to Succeed on its "Substantial Burden" Claims. .....................................................30

            1.    Prohibiting the Yeshiva throughout the Township constitutes a substantial burden on its religious exercise. ........................................................30

            2.    Denial of the Yeshiva's use variance substantially burdens its religious exercise. .......................................33

            3.    Complete prohibition of the Yeshiva's use and total denial of its use variance is not the least restrictive means of achieving any compelling governmental interest. ......39

D.    The Yeshiva is Very Likely to Succeed on its "Equal Terms"
      Claim. ......................................................................................42

II.   PLAINTIFF YESHIVA WILL SUFFER IRREPARABLE INJURY IF
      THE INJUNCTION IS DENIED, AS IT WILL BE UNABLE TO
      ENGAGE IN RELIGIOUS EDUCATION AND WORSHIP IN THE
      COMING ACADEMIC YEAR......................................................47

      A.    Deprivation of First Amendment Freedoms Is *Per Se*
            Irreparable Injury ..............................................................47

      B.    The Yeshiva Will Lack a Home for Its Religious Education and
            Worship Activity Unless It Begins Interior Renovations
            Immediately. ......................................................................47

III.  GRANTING PRELIMINARY RELIEF WILL NOT RESULT IN ANY
      HARM TO THE DEFENDANTS.................................................49

IV.   PRELIMINARY RELIEF WILL SERVE THE PUBLIC INTEREST. ..50

CONCLUSION ......................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Township. of W. Pikeland*, 721 F. Supp. 2d 361 (E.D. Pa. 2010) .........................................28

*Al Falah Ctr. v. Township of Bridgewater*, No. 11-2397, slip op. (D.N.J. Sept. 30, 2013) ...........................................................................................................24

*Alpine Christian Fellowship v. County Comm'rs of Pitkin Cty.*, 870 F. Supp. 991 (D. Colo. 1994) ...........................................................................................25

*Amerada Hess Corp. v. Burlington Cty. Planning Bd.*, 195 N.J. 616 (2008)..........35

*Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548 (4th Cir. 2013) ...........................................................................................................27

*Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846 (3d Cir. 1994) ...........................30

*Cathedral Church of the Intercessor, Inc. v. Village of Malverne*, No. 02–2989, 2006 WL 572855 (E.D.N.Y. Mar. 6, 2006).........................................................32

*Chabad Lubavitch v. Borough of Litchfield, Conn.*, 796 F. Supp. 2d 333 (D. Conn. 2011) ...........................................................................................................32

*Chabad of Nova, Fla. Inc. v. Cooper City, Fla.*, 575 F. Supp. 2d 1280 (S.D. Fla. 2008) ...........................................................................................................27

*Church of Our Savior v. City of Jacksonville Beach*, 108 F. Supp. 3d 1259 (M.D. Fla. 2015) ................................................................................................. 37, 46

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)........... 23, 28, 29, 42

*Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, No. 07-CV-6304 KMK, 2015 WL 5729783 (S.D.N.Y. Sept. 29, 2015).......................... 25, 36

*Congregation Rabbinical College of Tartikov v. Village of Pomona*, 915 F. Supp. 2d 574 (S.D.N.Y. 2013) .............................................................................. *passim*

*Corporation of the Catholic Archbishop of Seattle v. City of Seattle*, 28 F. Supp. 3d 1163 (W.D. Wash. 2014) ...............................................................................46

*Deegan v. Perth Amboy Redevelopment Ag'y*, 863 A.2d 416 (N.J. App. Div. 2005) ...........................................................................................................35

*DeMaria v. Jeb Brook, LLC*, 855 A.2d 628 (N.J. App. Div. 2003) .......................35

*Elijah Grp. v. City of Leon Valley, Tex.*, Civ. No. 08-0907, 2009 WL 3247996 (W.D. Tex. Oct. 2, 2009), *rev'd on other grounds*, 643 F.3d 419 (5th Cir. 2011)

.................................................................................................28

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................... 22, 47

*Fortress Bible Church v. Feiner*, 694 F.3d 208 (2d Cir. 2012).............................37

*Freedom Baptist Church of Delaware Cty. v. Township of Middletown*, 204 F. Supp. 2d 857 (E.D. Pa. 2002) ........................................................26

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) .................................................................................................40

*Grace United Methodist Church v. City of Cheyenne*, 235 F. Supp. 2d 1186 (D. Wyo. 2002) ........................................................................31

*Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978 (9th Cir. 2006) .................................................................................30

*Holt v. Hobbs*, 135 S. Ct. 853 (2015) ................................................40

*Hope Rising Cmty. Church v. Municipality of Penn Hills*, No. CV 15-1165, 2015 WL 7720380 (W.D. Pa. Oct. 28, 2015), *report and recommendation adopted*, 2015 WL 7721252 (Nov. 30, 2015)......................................... 22, 29, 46

*Israelite Church of God in Jesus Christ, Inc. v. City of Hackensack*, No. 11-5960, 2012 WL 3284054 (D.N.J. Aug. 10, 2012) .........................................38

*Layman Lessons, Inc. v. City of Millersville, Tenn.*, 636 F. Supp. 2d 620 (M.D. Tenn. 2008).................................................................37

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995)....................................24

*Lighthouse Inst. for Evangelism Inc. v. City of Long Branch*, 100 F. App'x 70 (3d Cir. 2004) .................................................................31

*Medical Ctr. at Princeton v. Princeton Twp. Zoning*, 778 A.2d 482 (N.J. Super. Ct. 2001) .................................................................41

*Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820 (10th Cir. 1988) ....31

*Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214 (11th Cir. 2004). 31, 46

*Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236 (3d Cir. 2011) ...22

*Munns v. Martin*, 930 P.2d 318 (1997).................................................37

*Muslim Ctr. of Somerset Cty., Inc. v. Borough of Somerville Zoning Bd. of Adjustment*, No. SOM-L-1313-04, 2006 WL 1344323 (N.J. Super. Ct. Law Div. May 16, 2006).................................................................32

*Open Homes Fellowship, Inc. v. Orange Cty., Fla.*, 325 F. Supp. 2d 1349 (M.D. Fla. 2004).................................................................42

*Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279 (5th Cir. 2012) ...................................................................................................47

*Oxford House-Evergreen v. Plainfield*, 769 F. Supp. 1329 (D.N.J. 1991)..............50

*Palmore v. Sidoti*, 466 U.S. 429 (1984)........................................................ 18, 23

*R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992)..............................................40

*Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) ................................................ 38, 47

*ReMed Recovery Care Ctrs. v. Township of Willistown*, 36 F. Supp. 2d 676 (E.D. Pa. 1999) .....................................................................................................50

*Rocky Mtn. Christian Church v. Board of Cty. Comm'rs*, 613 F.3d 1229 (D. Colo. 2010) ...................................................................................................28

*Roman Catholic Diocese of Rockville Centre, N.Y. v. Incorporated Village of Old Westbury*, No. 09-5195, 2012 WL 1392365 (E.D.N.Y. Apr. 23, 2012) .............37

*Saints Constantine and Helen Greek Orthodox Church v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) .............................................................................35

*Schad v. Borough of Mount Ephraim,* 452 U.S. 61 (1981) ....................................26

*Sherbert v. Verner,* 374 U.S. 398, 403 (1963).........................................................39

*Sica v. Board of Adjustment of Twp. of Wall*, 127 N.J. 152 (1992).................. 12, 33

*Stilp v. Contino*, 613 F.3d 405 (2010).....................................................................22

*The Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 406 F. Supp. 2d 507 (D.N.J. 2005), *aff'd in part, vacated in part*, 510 F.3d 253 (3d Cir. 2007). 31, 43, 45

*Town of Mount Pleasant v. Legion of Christ, Inc.*, 787 N.Y.S.2d 681 (N.Y. Sup. 2003), *aff'd*, 7 N.Y.3d 122 (2006), *cert. denied*, 549 U.S. 1208 (2007).............26

*Trinity Assembly of God of Balt. City, Inc. v. People's Counsel for Balt. Cty.*, 962 A.2d 404 (Md. 2008) .................................................................................30

*Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338 (2d Cir. 2007) ......................................................................................................... *passim*

*Westchester Day School v. Village of Mamaroneck*, 417 F. Supp. 2d 477 (S.D.N.Y. 2006) ...................................................................................................24

*World Outreach Conf. Ctr. v. City of Chi.*, 591 F.3d 531 (7th Cir. 2015) .............38

**Statutes**

Fair Housing Act, 42 U.S.C. § 3601 *et seq.*..........................................................4, 23

N.J.A.C. 5:23-2.16 .................................................................................49

N.J.S.A. § 40:55D-70............................................................................11

N.J.S.A. § 40:55D-73............................................................................11

N.J.S.A. § 40:55D-76........................................................................ 19, 35

New Jersey Rehabilitation Subcode, N.J.A.C. 5:23-6 ...........................................48

Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ........................................................................................ *passim*

U.S. Const. amend. I.......................................................................... *passim*

U.S. Const. amend. XIV .......................................................................23

**Other Authorities**

146 Cong. Rec. S7776 (daily ed. July 27, 2000)...............................................38

## PRELIMINARY STATEMENT

Plaintiffs Yeshiva Gedola Na'os Yaakov, Inc. ("Yeshiva") and Zebra Holdings II LLC ("Zebra") (collectively "Plaintiffs") seek preliminary injunctive relief: (a) directing the municipal defendants to cease enforcement of ordinances that violate statutory and constitutional provisions and suppress religious freedom; and (b) ordering the issuance of building and other permits so that the Yeshiva can begin interior renovations at an existing school building. As set forth more fully below, the Yeshiva is scheduled to open its *yeshiva gedola* in Ocean Township this Fall and therefore is willing to begin the interior renovations, at its own risk, so that it has at least a fighting chance to be ready for its rabbinical students in September. Any further delays work solely against the Plaintiffs and to the advantage of the Ocean Township community that has delayed and ultimately caused the denial of the Yeshiva's application for variance from the burdensome and discriminatory land use regulations, which themselves completely prohibit its use in the Township, in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*

The Yeshiva seeks to convert an existing Jewish elementary school and former boarding school to a small boarding school for 96 rabbinical students aged eighteen to twenty-two, otherwise known as a "*yeshiva gedola*," on a large three-acre parcel located in Ocean Township, Monmouth County ("Township"). This

1

use is prohibited throughout the Township. After applying for a use variance, the local Zoning Board of Adjustment ("Board") and, most significantly, the Ocean Township community have reacted to this innocuous land use with great hostility and animus[1] toward the ultra-Orthodox or "Haredi" Jewish community. Ample evidence demonstrates the objectors' fear of the Haredi community from nearby Lakewood Township overrunning "their" community.

As described below, the Yeshiva's need for a permanent home is dire. They are currently located at an inadequate temporary facility that can only accommodate one-third of its students. Its lease runs out in August and the owner wishes to sell the property. The property at issue, a 2.97-acre parcel located at 1515 Logan Road in Ocean Township, already improved with a school building (the "Property"), is currently a Jewish day school that creates greater land use impacts than will the proposed Yeshiva. There is no valid justification to prevent the *yeshiva gedola* use,

---

[1] As if to confirm the allegations in the Complaint, public statements responding to a local newspaper article about the filing of this suit describe the Haredi community as "viruses," "leeches," and "vultures," and include comments such as (among many others): "Go back to lakewood," "Ignore their stupid cries of 'anti-semitism', they're just as dangerous as any other group of nutty religious extremists. They WILL swoop in and bleed your town dry in any way they possibly can, it's what they do," "same behavior that got them kicked out of every country they ever sucked the life out of for the past 2000 years," "why are these holier than thou think they can still force their way in where they are not wanted," "I give them 20 years, they'll own all of Monmouth and ocean counties," and "They've destroyed Lakewood. Every town needs to keep these assholes out. They will bankrupt every town." *See* Jennings Decl. Exhs. A, B.

2

and all land use impacts will be improved with such use.

The local community has united not only to guarantee a denial of the Yeshiva's use variance application before the Board, but also to delay proceedings by "packing" hearings and repeatedly asking redundant and irrelevant questions of the Yeshiva's witnesses.[2] Hearings have dragged on for more than four times the statutory period of 120 days mandated by New Jersey law, and the Board has refused to hold sufficient hearings to meet its state law obligations, place any reasonable limitations on the thousands of objectors delaying proceedings, and ultimately to grant the Yeshiva's proposed use with conditions, if possible, to ameliorate any perceived detriments as required under New Jersey law. Instead, it denied the use outright based on the fact that it had not heard enough questioning and testimony from objectors, which would have continued indefinitely.

A preliminary injunction permitting the Yeshiva to merely perform interior renovations to the existing building situated on the Property is appropriate under these circumstances. The Yeshiva has a very strong likelihood of success; the facial

---

[2] The opposition is substantially motivated by anti-Semitic sentiment. They describe the Haredi community as "religious zealots," a "cult," "[s]cumbags," "dirty" and "Long coat gangsters," among many other invectives. Sentiments such as "Look what they did to my hometown of Lakewood. Stop the locusts from spreading throughout the state" and "can't our board members simply say that they are voting no because the town, of which they represent, doesn't want the Talmudic?" are common. Members of the local community even broke into the existing Jewish school on the Property and defecated on students' desks around the time the Yeshiva's application was filed.

3

and as-applied violations of RLUIPA, the Fair Housing Act ("FHA"), 42 U.S.C. §
3601 *et seq.*, and corresponding constitutional protections here are myriad. First,
the Township has prohibited the Yeshiva's religious land use throughout its
jurisdiction, in violation of RLUIPA's "total exclusion" provision, 42 U.S.C. §
2000cc(b)(3)(A), by prohibiting religious schools past the twelfth grade and also
because it prohibits boarding for individuals over eighteen years of age. As will be
discussed *infra*, these provisions were originally adopted to target the Haredi Jewish
community. Second, the Township's Land Development Ordinance ("LDO")[3]
favors nonreligious educational institutions over religious ones by permitting adult
education uses such as "Business," "Art" or "Music" schools, in violation of
RLUIPA's "equal terms" provision, *id.* § 2000cc(b)(1). Third, the Township's
complete prohibition of the Yeshiva's use, as well as the Board's denial of its
application for a use variance constitutes a substantial burden on the Yeshiva's
religious exercise, without being the least restrictive means of achieving any
compelling governmental interest. *Id.* § 2000cc(a).

Injunctive relief is warranted to prevent the irreparable injury that will
otherwise befall the Yeshiva if it is unable to provide a permanent home to the
anticipated 96 rabbinical students due to enroll this September 2016.

------

[3] The LDO limits and restricts development in specified zones as well as the
nature and extent of land use. Jennings Decl. Exh. D § 21-1.

## STATEMENT OF FACTS

### I.  The Yeshiva's Religious School and Need for a Facility.

The Yeshiva is a non-profit corporation that operates an institution for advanced study of the Jewish Torah and Talmud known as a *yeshiva gedola*. Declaration of Rabbi Shlomo Lesin ¶ 10.  A *yeshiva gedola* trains Jewish religious students who have already completed many years of Talmudic studies, generally between the ages of eighteen and twenty-two.  *Id.* ¶ 9.  Operating, teaching at, and studying at a *yeshiva gedola* is religious exercise and is motivated by the Yeshiva's sincerely held religious beliefs.  *See generally id.* ¶¶ 6-26, 30-34 (describing the program, the religious basis for such program, and the need for the religious school).  The Yeshiva's students are highly qualified and must remain unmarried during this period.  *Id.* ¶¶ 21-23.  Furthermore, students at the *yeshiva gedola* must remain isolated and focused on the academically and spiritually complex subjects. *Id.* ¶¶ 27-32, 35-43.  This isolation in a scholarly community is contemplated by the Talmud, which prescribes: "Exile yourself to a place of Torah and do not assume that it (Torah study) will come after you, [or] that your colleagues will cause it to remain with you; and do not rely on your own understanding."  *Id.* ¶ 36.  An isolated location where the Yeshiva's students can be immersed in a monastic religious experience is essential to the Yeshiva's mission.  *Id.* ¶¶ 35-41 (noting that yeshivot are the modern "caves and grottos and deserts" where Jewish scholars should seek

refuge). It is also important for the Yeshiva's students to have continuous access to its faculty. *Id.* ¶¶ 44-45.

The Yeshiva is currently unable to fulfill this religious mission for its students in its temporary Lakewood facility, *id.* ¶¶ 46-50, and is prohibited from doing so anywhere in Ocean Township, as described below. Until August of this year, the Yeshiva will continue to use its leased temporary facility in Lakewood,[4] which only has living facilities for approximately one-third of its students, leaving two-thirds of its students unable to be fully integrated in its religious facility. *Id.* ¶ 48. Consequently, many students must miss the beginning and ending of the school day, preventing the *yeshiva gedola* from coming together as a religious community. *Id.* ¶¶ 52-55. Other hardships exist, including the facts that the it lacks a library, it has inadequate classroom space, it is a temporary location that does not provide an adequate environment for students to be "exiled," *supra*; the Yeshiva has been unable to receive licensure or accreditation without a permanent facility; and it is unable to receive international students. *Id.* ¶¶ 50, 58, 65-68. Furthermore, the Yeshiva's lease on the temporary location will expire on August 19, 2016 and the owner of the Lakewood facility is seeking to sell that property. *Id.* ¶¶ 56-57.

---

[4] This facility was used only as a makeshift measure until land use permits could be obtained for the Ocean Township property. Lesin Decl. ¶¶ 47-48. It is located adjacent to a residential neighborhood and has never received any complaints for noise or other issues from its neighbors. Lesin Decl. ¶¶ 49.

6

## II.     The Subject Property.

The Yeshiva is a contract purchaser of the Property located at 1515 Logan Road in Ocean Township, *id.* ¶ 59, which is currently owned by Plaintiff Zebra. Rothschild Decl. ¶ 2. The Property is a 2.927-acre parcel that is currently improved with a two-story 17,714 square foot structure that has always been used as either a day or boarding school. *Id.* ¶¶ 3-6. The prior boarding school served approximately fifty boarded students in addition to 100 to 150 day students between 1997 and 2011. *Id.* ¶ 4. Since 2011, the Property has been used as an orthodox Jewish day school with 101 students. Rothschild Decl. ¶ 6. Both the current use and the proposed use by the Yeshiva of 96 students is far less than the building's maximum occupancy limit of 359 occupants or its "functional capacity" of 312 occupants. Declaration of Stephen J. Carlidge, AIA ¶¶ 14-16.

On January 14, 2014, once the Yeshiva had identified the Property, but prior to filing its application for a use variance, its then-attorney and planner met with the Township's Manager and the Director of Community Development to determine their opinion regarding a yeshiva with boarding that would include post-high school students. Declaration of Andrew Janiw, P.P. ¶¶ 7-11. After receiving feedback from the Township representatives regarding how to move forward with the administrative process and without any indication that the site was inappropriate or land use approvals would not be able to be obtained, *id.* ¶ 11, the Yeshiva decided

7

to move forward with filing its application.  Lesin Decl. ¶ 63.

The Property is uniquely suited to the Yeshiva's needs in Ocean Township, and the only property found during a year-long search.  Lesin Decl. ¶¶ 60-61.  No property within Ocean Township permits the Yeshiva's use.  According to the Township's zoning map, the Property is zoned "R-4," the Township's "Medium Density Single-Family Residential" zoning district.  Jennings Decl. Exh. E.  It is directly adjacent to three properties zoned "C-3 General Commercial Zone," one property zoned "R-7 Garden Apartment Residential," and one other property zoned "R-4."  *Id.*  The land uses adjacent to the Property are single family residences, the Wanamassa Gardens apartment complex containing 66 1- and 2-bedroom units, and a public park across the street.  Jennings Decl. Exh. F.  There is Master Secure Storage self-storage facility approximately 20 feet west of the Property.  *Id.*  There are many other commercial land uses located very close to the Property, including, but not limited to, retail uses, a bank, the Sunset Diner, a post office, the Ocean Plaza shopping center, a Seven-Eleven, and the Sunset Farm Market.  *Id.*

### III.    The Township's Land Use Regulations.

Ocean Township prohibits throughout its jurisdiction religious schools for individuals over the age of eighteen, and also prohibits dormitories for students over the age of eighteen, as described herein.  "All uses not specifically permitted in a zone are specifically prohibited in that zone."  Jennings Decl. Exh. D § 21-20.20.

The LDO also restricts both "Schools, parochial" and "School, private" to Kindergarten through Grade 12, and pre-school through Grade 12, respectively. *Id.* § 21-6. Although boarding schools are permitted as a conditional use in the R-4 district, *id.* § 21-26.1(c)(4), they are also restricted to students through Grade 12, as a "School, boarding" is defined as "a parochial school which provides residence halls or dormitories for boarding of students." *Id.* § 21-6. The LDO provides that "[b]oarding students shall be in grades 9 thru 12 and in no case shall a boarding school student be older than 18 years of age at the beginning of the academic year." *Id.* § 21-51.30(c)(3)(b). Furthermore, the Township unreasonably limits the boarding of students to 50, regardless of the size of the school or the property. *Id.* § 21-51.30(c)(3)(a). As a result, any *yeshiva gedola,* including the Yeshiva's religious school, is prohibited everywhere within Ocean Township.[5] The only two zoning districts where boarding schools are permitted are the Township's R-2 and R-4 zones. *Id.* § 21-24.1(c)(4), 21-26.1(c)(4). The R-4 zone permits higher density development than the R-2 zone. *Id.* §§ 21-51.30(b) (7-acre minimum lot area in R-2 district), 21-51.30(c) (2-acre minimum lot area in R-4 district).

The Township permits certain nonreligious schools for adults, including "Art

---

[5] Regarding these prohibitions, the Township's Planner stated that he "ha[d] intimate knowledge of, and can explain to the Board the reasons for this very strong language. First, the Ordinance was developed as the result of a rezoning request by the former [Orthodox Jewish] operators of this site." Jennings Decl. Exh. G. That "operator" was the Deal Yeshiva. Rothschild Decl. ¶ 3.

schools," "Dance schools," "Music schools," and "Business schools" elsewhere within its jurisdiction. *See id.* § 21-38.1(a)(1). It also permits certain nonreligious group housing uses in various zoning districts, including the R-4 zone. *See, e.g., id.* § 21-26.1(c)(6). Senior housing is permitted at a density of 20 units per acre, and thus approximately fifty-eight senior housing units would be permitted on a parcel the size of the Property. *Id.* § 21-51.22(b),(i).

Other permitted assembly and institutional land uses within the R-4 zoning district include: government buildings, churches, "public schools, parochial schools and boarding schools" and "community recreation centers." *Id.* § 21-26.1(c). Other nonreligious assembly and institutional land uses in other zoning districts include "Indoor Recreation Facilities," "Tavern," "Funeral services," "Health Clubs," "Museum," "Nursing Home," "Physical culture and health establishments," "Shopping Center," "Quasi-public uses including clubs, lodges, and similar uses," "Child Day Care Centers," "Movie Theater, Indoor," "Amusement center – game room," "Auditoriums," "Library," while the Yeshiva's land use is prohibited throughout the Township's jurisdiction. *Id.* §§ 21-32.1(c)(2), 21-35.1(a), 21-36.1(a), 21-36.1(c), 21-38.1(a)(1), 21-40.1(a)(6).

As a *yeshiva gedola* is prohibited throughout the Township, the Yeshiva's religious school cannot exist within the Township unless it obtains a "D-1" variance from the Board. A "D-1" variance is an individualized assessment of the

applicant's proposed use, which must be approved by a supermajority of five votes of the Board. N.J.S.A. § 40:55D-70(d). New Jersey law provides that a zoning board of adjustment must issue a decision on a use variance application within 120 days after it is deemed complete, or the application is automatically approved unless the applicant grants the Board an extension of time in which to act on the application. N.J.S.A. § 40:55D-73(b) & (c).

Two other yeshivas had previously attempted to obtain use variances to locate in Ocean Township, Beth Medrash of Asbury Park (at the subject Property) and Yeshiva of Ocean (in an office building at 1001 Deal Road). Jennings Decl. Exhs. H, I. Both of them had faced significant opposition from the community. *See* Jenning Decl. Exh. J (describing students as being from Monsey, NY and Lakewood, and discussing "criminal or sexual predator background checks"); *id.* Exh. OO at 3 (Board attorney telling Board members not to open emails regarding this application). Both were ultimately withdrawn after similar public hostility. Jennings Decl. Exhs. H, K (noting "fierce opposition"). A former Board member made clear that no *yeshiva gedola* would ever be welcomed in Ocean, comparing the Yeshiva and the Yeshiva of Ocean:

> [W]e organized the neighborhood. They held a number of long meetings. . . . It really invigorated our determination. The attorney (same woman) called us the day after one of the more vocal meetings and said the applicant wanted to compromise. They were willing to accommodate our concerns. We told her no compromise was acceptable and they could expect more of the same at the next meeting. Within a couple of days, they pulled the

11

> application. <u>Then we asked that the [Township] council proactively prevent</u>
> <u>this kind of application from coming forward again</u>. We were told it would
> definitely be addressed and something would be done.

Jennings Decl. Exh. L (emphases added); *id.* "No Dorm on Logan Road" excerpts,

Facebook Group, Jennings Decl. Exh. C at 338[6] (noting that opposition had packed

meetings to force Board to relocate hearings for the Yeshiva of Ocean's application

and suggesting the same for the Yeshiva; "I think they will finally get discouraged

enough to give up, or the Board will have no choice but to deny this Variance.").

## IV.    The Yeshiva's Application for Use Variance.

The Yeshiva originally applied to the Board for both "C" (bulk) and "D"

(use) variances and minor site plan approval on June 11, 2014 (the "Application").

Jennings Decl. Exh. M. The *yeshiva gedola* is considered an "inherently beneficial"

use under New Jersey law; thus, the Board was required to weigh this positive

criterion against any negative factors and determine whether the use variance could

have been granted without causing substantial detriment that cannot be reduced by

imposing reasonable conditions. *Sica v. Board of Adjustment of Twp. of Wall*, 127

N.J. 152 (1992). The Yeshiva's Application discussed the use of the existing

structures on the Property as a study hall, classroom, library, kitchen, dining room,

mechanical room, lobby, restrooms, shower room, offices, a resident faculty suite,

---

[6] The page numbers for references to Exhibit C of the Jennings Declaration correspond to the page number of the Facebook page, located in the bottom right corner of the pages of the document.

and several student dormitory rooms.  Lesin Decl. at ¶ 62.  The Yeshiva planned to reconfigure the existing structures such that the physical appearance would be vastly improved.  *See* Jennings Decl. Exh. N.

The Board held nine hearings on the matter between October 23, 2014 and December 1, 2015.  The Board limited proceedings on the Yeshiva's application to only 45 minutes at its regular meetings in October, November and December 2014.  Jennings Decl. Exh. O at 39-40; Exh. P at 40; Exh. Q at 42-43.  The capacity of the Board's hearing room was reached on December 11, 2014, and no additional people could be let in.  *Id.* at 8:1-7.  Thereafter, because of the size of the crowd opposed to the Yeshiva, special meetings had to be held.  The Board Chairman stated that such special meetings would be "a logistical nightmare," "inconvenient," "a cost," and that "the logistics are a little difficult, so it's not always easy to do that." *Id.* at 44:24-45:6.  These special meetings were held in 2015 on February 24, May 18, July 15, September 30, October 7, and December 1.  Jennings Decl. Exh. R at 1.  Hearings on the application only occurred approximately every two months.

At these hearings, members of the Board and the public often focused on irrelevant issues, which were part of the long campaign to delay proceedings and waste the Yeshiva's resources.[7]   Just a few examples included the Board

---

[7] The crowd's hostility toward Haredi Jews was generally not explicit at the public meetings, having been warned to "Stick to a prepared script which does not include any inflammatory reference to 'those people' or 'look at Lakewood' . . . ."

13

Chairman's questions regarding the accreditation status of the Yeshiva, Jennings
Decl. Exh. S at 21:11-23:3; the amount of "sunlight" students will receive, *id.* at
36:6-11; repeated questioning about a murder that occurred in Long Beach, New
York decades ago, *id.* at 50:24-51:3, 52:21-3, 57:3-58:6; whether the Yeshiva will
follow "religious laws," *id.* at 51:11-55:1; criminal background checks of students,
*id.* at 55:14-15; what financial benefit or community service students will bring to
local businesses, *id.* at 59:16-60:25; whether the Yeshiva will make a payment in
lieu of taxes, *id.* at 66:5-67:24; and what medical care the students will receive and
which ambulance service it will use, *id.* at 71:25-74:3.   The Yeshiva's
representatives were also often mocked by the crowd.  *See id.* at 55-56 (Board
Chairman noting that "everybody [laughed] every time a witness does not answer
the question the way we want it to be answered."); *id.* at 27:8-14 ("CHAIRMAN
VAN WAGNER: If I could just ask for a quick second, . . . I've never been on a
stage, but the acoustics are really good in here, so I can hear everything everyone
is saying, and some of it's funny."); Jennings Decl. Exh. T at 53:22-54:23.

The opposition to the Yeshiva's application by the Ocean Township
community was motivated by hostility towards Haredi Jews and not legitimate land
use concerns.[8]  Opponents of the Yeshiva started online petitions and fundraising

_____

Jennings Decl. Exh. C at 178-179.   That did not stop them from making such
statements <u>outside</u> of such hearings, however, as discussed below.

[8] Just prior to the filing of the Yeshiva's Application, four individuals broke

campaigns, hired an airplane with a banner to advertise the hearing dates, Jennings

Decl. Exh. BB, put up yard signs throughout the Township, Jennings Decl. Exh.

CC, and started a "secret" Facebook group with approximately 2,000 members.

Anti-Semitic material was posted online by individuals speaking at Board hearings.

*See, e.g.,* Jennings Decl. Exh. DD (posting a photograph of a Haredi family on a

front porch and stating "Is this the future for Jackson"); Jennings Decl. Exhibit EE

at 130:15-147:6. As another opponent asked:

> Paul, can't our board members simply say that they are voting no
> because the town, of which they represent, doesn't <u>want the Talmudic</u>?
> Aren't they simply our representatives??? Can't they list our reasons as
> their reasons??? . . . .

Jennings Decl. Exh. C at 90.  Statements on the Facebook page created to coordinate

opposition to Yeshiva and titled "No Dorm on Logan Road" included:

- "we Do NOT WANT TO BE LAKEWOOD . It's time to take off the boxing
  gloves , hIt hard and fast . Lets fill the seats and show we mean business.
  DON'T LET THIS GET SHOVED UP OUR ASS?" Jennings Decl. Exh. C
  at 315.
- "This is your town. You want to keep it or lose it? This application is only
  the beginning." *Id.* at 60.
- "Lakewood is nothing to aspire to as far as a model town for ALL people.
  'Concerned with keeping themselves spiritually clean, the Hasidim are
  preoccupied with ideas of biblical concepts of purity and contamination.'"
  *Id.* at 255.
- "If some people have nothing to contribute to our community as a group,
  stay where you are at! We welcome givers, not takers!" *Id.* at 16.
- "They don't care about anyone but themselves. There is no respect for the
  community at large but we should all bend to them." *Id.* at 139.

---

into the existing Jewish day school on the property and defecated on students' desks.
Jennings Decl. Exh. GG.

- "These 'chosen' people do not abide by the rules in our society & are raising a generation that simply cannot hold a job to support their large family. Lakewood has gone to hell & if they build in Ocean watch the 'Monsey' effect..." *Id.* at 317.
- "I don't want to live in a town like Lakewood, Monsey etc. That's not living with good neighbors who share a common ideal as to community, sense of neighborhood and living/working together." *Id.* at 149.
- "Their religion is male based & segregated from worshiping with women. Very similar to the Islam religion. Women are nothing!!" *Id.* at 286.
- "We all lose any value we have in our homes if we become the next Lakewood……" *Id.* at 244.
- "What possible benefit could there be to changing the face of our small town to that of something like Lakewood?" *Id.* at 257.
- "Hasidim also preserve their separation through a separate school system. One of the very first things the Hasidim did upon settling in America was to found schools and yeshivas." *Id.* at 256.
- "[W]hat benefit is that to our community????? They still wouldn't pay taxes or contribute in any way. It is such a crime that this is even considered." *Id.* at 241.
- "They will not interact with or provide any contributions to the town. Women, children, minorities and all other religions are excluded." *Id.* at 300.

Comments on other public websites include:

- "Look what they did to my hometown of Lakewood. Stop the locusts from spreading throughout the state." Jennings Decl. Exh. FF at 32.
- "I live in the town and I want the religeous [sic] zealots stopped from bringing in more adult students. They can cgo [sic] to the catskills and build there, or go to Isreal [sic] if they want." *Id.* at 45
- "I owned property in Lakewood NJ for 24 years. Orthodox Jewish landlords made life a living hell for me there! I would hate to see this repeated in Ocean!" Jennings Decl. Exh. FF at 5.
- "There are plenty of other places for radical religious schools." Jennings Decl. Exh. FF at 18.
- "This sounds more like a cult organization then a religious group." Jennings Decl. Exh. FF at 12.
- "I live here and want the town to remain EXACTLY the way it is." Jennings Decl. Exh. FF at 19.

16

- "try Lakewood suckers," Jennings Decl. Exh. Z at 17.[9]
- "Uniform voting block of an insular group that has a local reputation for bleeding educational funds while disassociating themselves from the original community that provide these funds? Does that work for you?" Jennings Decl. Exh. Z at 5.

This hostility manifested in an organized effort to delay and cause the Yeshiva to incur undue expense in an attempt to force it to withdraw its application, as other yeshivas had done. Evidence of this effort includes:

- "Hearings will continue to happen as long as citizens come to oppose the dormitory." Jennings Decl. Exh. U.
- "Applicant pays for any alternate venues!" "That makes it even sweeter!" Jennings Decl. Exh. C at 113.
- "[I]t is better they adjourned it because it presents more inconvenience and displays the huge amount of opposition!" *Id.* at 114.
- "[I]t will also cost the applicant thousands." *Id.*
- "The more it costs them the better!" *Id.*
- "If these guys want to go into their pocket for 10 grand at the college, that's ok by me. Smile emoticonsmile emoticon" "Me too…." *Id.*
- "The applicant has to pay for everything! Renting the meeting room, expert witness, lawyers etc. Case in point the expert witness for noise has to come back and he will charge them for another appearance." *Id.* at 114.

There was a concerted effort to "pack" hearings, which results in delaying the proceedings. Statements made by objectors included:

- "I also tell people that you don't necessarily have to stay until the end. In my opinion, once you arrive, and your [sic] accounted for (the police officers

---

[9] Opponents also began a fundraising campaign at the following website: https://www.youcaring.com/ocean-township-residents-358710, which raised thousands of dollars to pay for the objectors' attorney, John Poulos, who also participated in the "Secret" Facebook group discussion, "No Dorm on Logan Road" and coordinated with objectors. *See generally* Jennings Decl. Exhs. C at 156, HH.

use a clicker to tally attendance counts), you can always leave during a break in the action. . . . I bring my children with me and have them do homework, then my husband picks them up to go home." Jennings Decl. Exh. C at 32.

- "We need to <u>PACK THE ROOM</u>.  AT LEAST 2000 PEOPLE WILL BE NEEDED TO DEMONSTRATE OUR OPPOSITION TO THIS CHANGE IN USE.  Bring everyone including your kids . . . ." Jennings Decl. Exh. V.
- "Let's pack the school by bringing one more person each then [sic] you brought last time." Jennings Decl. Exh. C at 87.
- "Let's stay focused and most important we need every seat taking [sic] at the next meeting. Standing room only." Jennings Decl. Exh. C at 237.
- "They didn't vote tonight. Got put off until next month. It's a good thing. Gives us more time to gather information and to get more people to show up." Jennings Decl. Exh. X.
- "This is a reminder of the meeting at the high school tonight. 7 pm. No Dorm on Logan. Let's pack the room. Please share." Jennings Decl. Exh. Y.[10]
- "We are looking for thousands of attendees, not just hundreds." Jennings Decl. Exh. C at 163; Jennings Decl. Exh. Z at 3.
- "There is power in numbers! . . . . Let's Pack the Room!" Jennings Decl. Exh. W.
- "[W]e need to PACK THE ROOM!! EVERY.SINGLE.TIME!" Jennings Decl. Exh. C at 230.

These efforts (motivated by anti-Semitic bias, *see supra*) directly led to the delays, enormous costs,[11] and ultimate denial of the application, as described below.  Such hostility is relevant to Plaintiffs' constitutional, RLUIPA, and FHA claims.  *See Palmore v. Sidoti,* 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").  The Board "g[a]ve them effect" as its Chairman stated:

---

[10] Individuals engaged in active hostility on Facebook regularly participated at the Board hearings. *See, e.g.,* Jennings Decl. Exh. KK at 142:21-145:15 (Tara Manning questioning Yeshiva's witness); Exh. Q at 39-41 (Gino Dellomo questioning Yeshiva witness).

[11] The Plaintiffs have already spent approximately $343,000 on these efforts. Lesin Decl. ¶ 69; Rothschild Decl. ¶ 7.

So, believe me, this application will continue for as long as we need it to for everyone's concerns and everybody here to be heard, if that's what it takes.

Jennings Decl. Exh. S at 6:17-20. And as the Township's Mayor Christopher Siciliano stated when he described the Yeshiva's application as an "application[] we may not feel is good for the community," "[W]e are your advocates, never forget that! We understand that, and appreciate that you voted for us and entrusted us to do what is right for you and the entire community at large!" Jennings Decl. Exh. AA at 1. Mayor Siciliano also referred to the Yeshiva's application as "No Dorm on Logan Road" in Facebook comments, indicating his hostility to the use and solidarity with the opposition. Jennings Decl. Exh. AA. at 2.

On July 15, 2015, the Yeshiva exercised its right to bifurcate the use variance from the site plan components of its application. Jennings Decl. Exh. at HH; N.J.S.A. § 40:55D-76. Since there would be no point to extending the protracted proceedings with site plan details if the *yeshiva gedola* use were not permitted, the Yeshiva decided to postpone such review until after its variance application was decided. The objectors strenuously opposed the bifurcation, even though New Jersey law clearly permits an applicant to do so, knowing that it would prevent them from additionally delaying proceedings. Jennings Decl. Exh. at II.

Ultimately, as it became clear that there were no actual negative impacts from the use, the Board and community members began to focus on the issue of "noise," namely the sound of the Yeshiva's students praying in the evening. *See, e.g.,*

19

Jennings Decl. Exh. LL at 28:10-29:24, 40:2-41:13, 46:22-49:12, 50:4-51:10.  On

July 15, 2015 the Yeshiva, in an effort to satisfy these stated concerns, attempted

to present the testimony of sound expert Stephen Szulecki.  Jennings Decl. JJ at at

7:24-9:16, 30:1-5.  The first hearing of his testimony was adjourned after only forty

minutes, eliciting cheers and applause, after local residents "packed" the hearing

beyond capacity.  *Id.* at 32:1-16.  This cheering when a meeting was canceled is

further evidence of the intent to delay:

- "MR. STEINBERG: The fire marshal is here. We have maxed or possibly exceeded our capacity. (Public applause) . . . . MR. STEINBERG: Can I have your attention? Ladies and gentlemen, we have been advised by the fire marshal we have now -- please don't applaud -- we've exceeded capacity, okay. . . .
- "CHAIRMAN GOODE: Meeting is adjourned.  (Public applause)"
- "CHAIRMAN GOODE: So we're going to have to -- we're going to have to -- (Audience applause) CHAIRMAN GOODE: We're going to carry this application to a date not certain; . . . ." Jennings Decl. Exh. JJ at 31:1-32:16.

Individuals then delayed further proceedings through repetitive and

irrelevant questioning of this expert.  *See, e.g.,* Jennings Decl. Exh. KK at 15:8-13,

117:2-6 ("This is the fourth, if not the fifth time, I think, that Mr. Szulecki has

described both the composition of the building itself, as well as the interior finishes,

. . . ."); *id.* at 117:23-24; *id.* at 118:8-18; *id.* at 51:14-61:2 (questioning about the

sound of air conditioning units in the <u>winter</u>).  No time limitations were put on such

questioning.  Jennings Decl. Exh. EE at 7:11-20 (Board attorney stating that it was

"not fair" to place time limits on questioning).  Questioning of Mr. Szulecki

continued through the September 30 and October 7 hearings, Jennings Decl. Exh. T at 2, Jennings Decl. Exh. KK at 2, with no end in sight. *See* Jennings Decl. Exh. KK at 152:1-153:22 (public applause at Board Chairman statement that questioning of sound expert will again have to be continued).

After nearly a half-year of this farce involving the sound expert, it became clear to the Yeshiva that it would never be able to obtain a timely decision on its application, and that the community, accommodated by the Board, was going to ensure that the Yeshiva would suffer great delay and undue expense throughout the remainder of the proceedings. As such, the Yeshiva refused to consent to further extensions. By law in New Jersey, the Board must issue its decision within 120 days unless such consent is obtained. N.J.S.A. § 40:55D-73(b),(c).

Throughout the proceedings, the Yeshiva stated that it would accept any reasonable conditions imposed by the Township. Jennings Decl. Exh. LL at 83:11-13 ("MS. KRIMKO: As we stated in the beginning, any reasonable conditions the applicant is happy to agree to."); *id.* Exh. T at 9:24-10:2 (same); *id.* at 53:3-5 (same); *id.* Exh. EE at 117:3-11 (same). Nevertheless, the Board denied the variance application on December 1, 2015 "without prejudice" due to "insufficient information." Jennings Decl. Exh. R at 4.

## STANDARD OF REVIEW

When considering a preliminary injunction, a Third Circuit Court is required

21

to balance the following factors: "(1) a likelihood of success on the merits; (2) that [plaintiff] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 249-50 (3d Cir. 2011). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Stilp v. Contino*, 613 F.3d 405, 409 (2010) (where First Amendment freedoms were allegedly violated, only likelihood of success was at issue).

## ARGUMENT

As described below, Plaintiffs are likely to succeed on the merits. Most of the facts relevant to this Motion, including the needs of the Plaintiffs, the land use regulations, the record of the zoning hearings and public statements of the Ocean Township community, should be undisputed. *See generally Hope Rising Cmty. Church v. Municipality of Penn Hills*, No. CV 15-1165, 2015 WL 7720380, at *5 (W.D. Pa. Oct. 28, 2015) (granting preliminary injunction where church "is likely to succeed on the merits of its RLUIPA Equal Terms claim"), *report and recommendation adopted*, 2015 WL 7721252 (Nov. 30, 2015).

Even putting aside the strong backdrop of anti-Semitism and specific hostility to the Haredi Jewish community, it cannot reasonably be doubted that the

22

Defendants' land use regulations prohibit the Yeshiva's use completely within its jurisdiction, and treat other similarly situated uses on more favorable terms. Therefore, Plaintiffs' facial and as-applied challenges brought under RLUIPA's (a) "total exclusion," (b) "unreasonable limitation," (c) "substantial burden" and (d) "equal terms" provisions are likely to succeed.  Given this likelihood of success, all of the other factors counsel in favor of an injunction.

## V.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

As discussed herein, Plaintiffs are highly likely to succeed on their claims that the Township's LDO, on its face and as applied to the Yeshiva, violates the First Amendment and RLUIPA by prohibiting the Yeshiva's use altogether, denying it reasonable opportunities to exist in the jurisdiction, burdening its religious exercise through such prohibition and variance denial, and treating the Yeshiva's use differently and worse than nonreligious assembly and institutional land uses.[12] In

---

[12] There is also little question that the passage of the prohibitory ordinances and the denial of the use variance resulted from significant anti-Haredi Jewish animus in violation of the First and Fourteenth Amendments, the Fair Housing Act, and RLUIPA; however, this Motion focuses on the undisputed restraints on the Yeshiva's religious exercise that do not depend on such fact-sensitive inquiry. Nevertheless, the manipulation of the zoning process by the hostile Ocean Township community clearly supports a finding of a high likelihood of success on these claims, as well. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (the law cannot directly or indirectly, give effect to "private biases." (quoting *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984))); *Congregation Rabbinical College of Tartikov v. Village of Pomona,* 915 F. Supp. 2d 574, 616 (S.D.N.Y. 2013) (statements by elected official regarding a contentious zoning application were sufficient to establish a prima facie case of a targeted ordinance); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d

addressing the various claims discussed below, the provisions of RLUIPA "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g). Furthermore, Ocean Township is a "jurisdiction," and both the Township and the Zoning Board are "governments" under RLUIPA. 42 U.S.C. § 2000cc-5(4). The Land Development Ordinance ("LDO") chapters of its Code are "land use regulations." 42 U.S.C. § 2000cc-5(5). By adopting the challenged provisions of the LDO and applying them against the Yeshiva, the Defendants have both "impose[d]" and "implement[ed]" them against the Yeshiva. *Id.* §§ 2000cc(a), 2000cc(b)(1), 2000cc(b)(3).

Additionally, the Yeshiva's proposed land use (religious education) constitutes religious exercise. *See, e.g., Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 915 F. Supp. 2d 574, 629 (S.D.N.Y. 2013) (Rabbinical college with student housing is religious exercise) ("*Tartikov*"); *Westchester Day School v. Village of Mamaroneck*, 417 F. Supp. 2d 477 (S.D.N.Y. 2006); *Alpine*

_____

412, 425 (2d Cir. 1995) (community hostility against a protected class can support a finding of discrimination if the government decisionmakers were knowingly responsive to the community); *Al Falah Ctr. v. Township of Bridgewater*, No. 11-2397, slip op. at 13, submitted herewith (D.N.J. Sept. 30, 2013) (government "must not 'defer[ ] to the [discriminatory] wishes or objections of some fraction of the body politic.' [*Cleburne*, 473 U.S. at 448.] Thus, the Court examines whether a reasonable jury could infer from this record that private citizens' 'hostility motivated the City in initiating . . . its . . . efforts.'").

24

*Christian Fellowship v. County Comm'rs of Pitkin Cty.*, 870 F. Supp. 991 (D. Colo. 1994). There is no secular component to the *yeshiva gedola*; the entire facility, including study hall, classrooms, offices and dormitory rooms are all part of this religious exercise and constitutes a religious assembly and institution, and the building is a religious structure within the meaning of RLUIPA. The statute defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and provides further that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered . . . religious exercise." 42 U.S.C. § 2000cc–5(7)(A),(B). "Religious exercise" under RLUIPA is defined broadly "to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g). In a similar case involving an Orthodox Jewish religious school, a federal court in New York held that "'the building of rabbinical college,' of which student housing would be a part, 'falls squarely within [the] definition of 'religious exercise,' 'and that 'the multi-family dormitories that [Plaintiffs] seek to build are intended to facilitate religious exercise.'" *Congregation Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, No. 07-CV-6304 KMK, 2015 WL 5729783, at *47 (S.D.N.Y. Sept. 29, 2015) (quoting *Tartikov*, 915 F. Supp. 2d at 629); *see also Town of Mount Pleasant v. Legion of Christ, Inc.*, 787 N.Y.S.2d 681, at *4 (N.Y. Sup. 2003) (religious plaintiff's use of religious conference and training facilities with "250 bedrooms" is

25

part of the "fulfillment of its mission to train and educate lay and ordained people in the Catholic faith and, thus, as part of its religious exercise."), *aff'd,* 7 N.Y.3d 122 (2006), *cert. denied,* 549 U.S. 1208 (2007); *Havurah v. Zoning Bd. of Appeals*, 418 A.2d 82, 87-88 (Conn. 1979) ("sleeping accommodations are essential to its religious fellowship, and that their absence would severely limit its religious activities."). *See generally* Lesin Decl. ¶¶ 27-46 (describing importance of dormitories for Plaintiff's *yeshiva gedola*).

A. <u>The Yeshiva is Likely To Succeed on its "Total Exclusion" Claim.</u>

RLUIPA provides that "[n]o government shall impose or implement a land use regulation that . . . (A) totally excludes religious assemblies from a jurisdiction; . . . ." 42 U.S.C. § 2000cc(b)(3)(A) (emphasis added). *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61 (1981) (municipality cannot prohibit a category of expressive activity outright from a jurisdiction); *Tartikov,* 915 F. Supp. 2d  at 637 (challenge to ordinances that prevent plaintiffs from building a viable "rabbinical college" was "sufficient to make out a plausible Exclusions and Limits claim."); *Freedom Baptist Church of Delaware Cty. v. Township of Middletown,* 204 F. Supp. 2d 857, 870 (E.D. Pa. 2002) ("It is, for example, well-established that a municipality cannot entirely exclude a type of conduct that the First Amendment protects.").

In this case, there is no question that the LDO completely prohibits the Yeshiva (or anyone else) from operating a *yeshiva gedola* within the Township, both

26

because it is a religious school for students older than the age of eighteen, and because boarding students are limited to ninth through twelfth grades. Although the LDO permits secular schools for adults and housing communities for adults (*see* § I(d), *infra*), this particular religious use is not permitted anywhere in the jurisdiction. Thus, the Yeshiva's First Amendment rights have been infringed and it is very likely to succeed on its "Total Exclusion" claim.

B.   The Yeshiva is Likely to Succeed on its "Unreasonable Limitations" Claim.

Congress also provided statutory protections against unreasonable limitations on "religious assemblies, institutions, or structures" in section 2000cc(b)(3)(B) of RLUIPA:

> No government shall impose or implement a land use regulation that . . . [u]nreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

The "unreasonable limitations" provision of RLUIPA applies where land use regulations "make it difficult for religious institutions to locate anywhere within the jurisdiction." *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 560 (4th Cir. 2013). *Compare Chabad of Nova, Fla. Inc. v. Cooper City, Fla.*, 575 F. Supp. 2d 1280, 1289-91 (S.D. Fla. 2008) (finding unreasonable limitation where a synagogue was limited to a specific zone and would be forced to incur additional expense in order to satisfy special frontage requirements), *with Elijah Grp. v. City of Leon Valley, Tex.*, Civ. No. 08-0907, 2009 WL 3247996, at

*9 (W.D. Tex. Oct. 2, 2009), *rev'd on other grounds*, 643 F.3d 419 (5th Cir. 2011) ("The ordinance does not violate the unreasonable-limitation provision because the ordinance creates a zoning district for church assembly use.").[13]

Facts that tend to establish an unreasonable limitation include the availability of alternate sites for construction within a jurisdiction; costs incurred by religious organizations from complying with a municipality's processes; and disparate treatment by County or City officials, especially if it leads the applicant to spend more time and money on its application. *Rocky Mtn. Christian Church v. Board of Cty. Comm'rs*, 613 F.3d 1229, 1238-39 (D. Colo. 2010). Here, there are no available sites and the additional costs—exceeding $343,000, Lesin Decl. ¶ 69; Rothschild Decl. ¶ 7—are very substantial.

Furthermore, the specific prohibitions on the Yeshiva's use, which are related to the age of students, are unreasonable because they are not related to any legitimate governmental interest. *See Cleburne*, 473 U.S. at 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so

---

[13] A total prohibition is not necessary to demonstrate a violation of the unreasonable limitations provision, which would render it superfluous with the "total exclusion" provision, *supra*. Rather, the purpose of this provision is "'to prevent municipalities from broadly limiting where religious entities can locate.'" *Id.* (citing *Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Township of W. Pikeland*, 721 F. Supp. 2d 361, 387 (E.D. Pa. 2010)); *see Rocky Mountain Christian Church*, 613 F.3d at 1238 (religious assemblies need not be "totally excluded"); *Tartikov*, 915 F. Supp. 2d at 637 (citing same).

attenuated as to render the distinction arbitrary or irrational."). Here, the local community has resorted to claims of irrational fear of the students themselves. *See, e.g.,* Jennings Decl. Exh. S at 31:3-17 (Board Chairman discussing possibility of "men who can walk off any time they want"); *id.* at 48:12-16 (resident questioning whether Yeshiva can control "20-year-olds"); Jennings Decl. Exh. EE at 49:12-25 (Board member questioning (to applause) whether "18 to 22-year old adults . . . won't have a substantial detriment on the surrounding area"); Jennings Decl. Exh. S at 56:18-21 (fear of students being "convicted criminals" or "sex offenders"). Even more irrational is the fact that the Property is located directly adjacent to several apartment buildings, which could house numerous "men," and located within the immediate proximity of many commercial and retail uses, which also draw countless "men." Of course, the local community has no concern otherwise about other adult men—presumably they make up about 50% of its adult population—their target is Haredi men. *Cleburne*, 473 U.S. at 448 (holding that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . are not permissible bases for" differential treatment).

Injunctive relief is appropriate here, where the underlying facts are not in dispute and the Yeshiva is neither a permitted nor conditional use anywhere in the Township. *Cf. Hope Rising Cmty. Church*, 2015 WL 7720380, at *4 (holding against church on "unreasonable limitation" claim because plaintiff's religious use

29

was permitted as "a conditional use in residential districts").

C.   The Yeshiva is Likely to Succeed on its "Substantial Burden" Claims.

1.   *Prohibiting the Yeshiva throughout the Township constitutes a substantial burden on its religious exercise.*

Both RLUIPA and the First Amendment protect the Yeshiva from governmental land use restrictions that substantially burden religious exercise. 42 U.S.C. § 2000cc(a);[14] *Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846, 849 (3d Cir. 1994). Here, the burden is not only substantial, it is absolute. The Yeshiva is forbidden outright in the Township. "[Z]oning ordinances, or zoning decisions, that significantly lessen the prospect of a religious institution's being able to use the property to further its religious mission contravenes RLUIPA." *Tartikov*, 915 F. Supp. 2d at 574 (citing *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 992 (9th Cir. 2006)); *The Lighthouse Inst. for Evangelism, Inc. v. City of*

---

[14] Two of the three jurisdictional prerequisites under subsection (a) apply here: as "the substantial burden affects, or removal of that substantial burden would affect, commerce . . . among the several States," *see* Lesin Decl. ¶ 62 (planned renovations will cost $700,000); *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 354 (2d Cir. 2007) ("*WDS II*") ("commercial building construction is activity affecting interstate commerce"), and because "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(B),(C); *Trinity Assembly of God of Balt. City, Inc. v. People's Counsel for Balt. Cty.*, 962 A.2d 404, 426 (Md. 2008) ("variance process involves 'individualized assessments,' . . . .").

*Long Branch*, 406 F. Supp. 2d 507, 515-16 (D.N.J. 2005) (holding that no substantial burden existed where "suitable alternative venues are available to the Mission in 90% of the rest of the City of Long Branch"),[15] *aff'd in part, vacated in part,* 510 F.3d 253 (3d Cir. 2007).  The Third Circuit noted that "several sister circuits have held that, when the plaintiff does not show that locating its premises in a particular location is important in some way to its religion and the area from which plaintiff's building is excluded is not large, there is no constitutionally cognizable burden on free exercise."  *Lighthouse Institute for Evangelism*, 510 F.3d at 274 (emphasis added) (collecting cases).  Here, the area where the Yeshiva is excluded is not just large; it is the entire jurisdiction.  This can be compared with cases where no substantial burden was found.  *See, e.g., Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (synagogues were permitted in some, but not all of town's districts); *Grace United Methodist Church v. City of Cheyenne*, 235 F. Supp. 2d 1186, 1189 (D. Wyo. 2002) (religious day care center permitted in "several other areas of the City"), *aff'd,* 427 F.3d 775 (10th Cir. 2005); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 821–22 (10th Cir. 1988) (church

---

[15] In an unpublished decision, the Third Circuit has held that a religious organization had not established a likelihood of success under RLUIPA's "substantial burdens" provision where it "could have operated as a church by right in other districts in the City," and where it had "operated for years at the rented location in the district . . . ."  *Lighthouse Inst. for Evangelism Inc. v. City of Long Branch*, 100 F. App'x 70, 77 (3d Cir. 2004).  Neither of these conditions apply here, as the Yeshiva is forbidden throughout the jurisdiction.  *See supra.*

31

permitted by right in thirteen out of sixteen zoning districts authorizing residential use); *Muslim Ctr. of Somerset Cty., Inc. v. Borough of Somerville Zoning Bd. of Adjustment*, No. SOM-L-1313-04, 2006 WL 1344323, at *9 (N.J. Super. Ct. Law Div. May 16, 2006) (finding "no substantial burden, as the institution was not completely excluded from the city and could have operated in other districts within the city by right, such as in a commercially-zoned district").

Courts have also held that zoning schemes that impose conditions on the use of the property—such as the age limitations that prohibit the Yeshiva's use—can impose a substantial burden. *See Chabad Lubavitch v. Borough of Litchfield, Conn.*, 796 F. Supp. 2d 333, 343 (D. Conn. 2011) (finding substantial burden allegations sufficient based on claims that municipality limited the size of plaintiff's expansion, and describing that "if [the plaintiff] conformed its plans to the [municipality's] specification, it would need to sacrifice a good portion of the spaces that it believes is necessary to the exercise of its religion"); *Cathedral Church of the Intercessor, Inc. v. Village of Malverne,* No. 02–2989, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006) (finding plaintiff adequately alleged substantial burden, where space limits imposed by the defendants "constrained" the ability of the church's parishioners to observe or participate in religious services).

Nor can the prohibitions be characterized as benign "neutral and generally applicable" laws under a Free Exercise Clause analysis. They were adopted

specifically to target this type of use and even this site.  As the Township's Planner stated, he "ha[d] intimate knowledge of, and can explain to the Board the reasons for this very strong language.  First, the Ordinance was developed as the result of a rezoning request by the former [Orthodox Jewish] operators of this site.  That request was geared towards this site."  Jennings Decl. Exh. G at 4.

> 2. *Denial of the Yeshiva's use variance substantially burdens its religious exercise.*

Although the Township's complete ban of the Yeshiva's use is, by itself, a substantial burden on its religious exercise, in the apparently mistaken belief that it would be treated fairly, the Yeshiva applied for a use variance from these provisions. Jennings Decl. Exh. M.  After discussions with the Township Manager and the Director of Community Development, who reacted positively to the proposal, the Yeshiva had a reasonable expectation at the time that it could be granted such variance, especially under New Jersey law which required the Board to grant the variance if any negative impacts could be reduced by imposing reasonable conditions.  *See* Janiw Decl. ¶¶ 7-11; *Sica v. Board of Adjustment of Township of Wall*, 127 N.J. 152 (1992); *see Bethel World Outreach Ministries*, 706 F.3d at 558 (holding in favor of church where it had "rais[ed] a question of material fact as to whether it had a reasonable expectation of being able to build a church"). Nevertheless, it was denied outright.  Jennings Decl. Exh. R at 5.

Such a complete denial works a substantial burden on religious exercise.  *See*

*WDS II*, 504 F.3d at 349 ("When the school has no ready alternatives, or where the alternatives require substantial 'delay, uncertainty, and expense,' a complete denial of the school's application might be indicative of a substantial burden."). Here, there are no "quick, reliable, and financially feasible alternatives [the Yeshiva] may utilize to meet its religious needs absent its obtaining the" variance. *See id.* at 352.

The Board will likely argue that it denied the variance because it did not have a chance to hear more objector questioning and testimony from the thousands of hostile members of the local community, and to allow the objectors' attorney to present myriad witnesses to further delay proceedings,[16] and to continue the interminable cross-examination of the Yeshiva's witnesses. Jennings Decl. Exh. R at 5. This would be wrong for three reasons.

First, the Board had an obligation to complete its review within 120 days under State law. The Board cannot now blame the Yeshiva for not waiving its statutory right to a reasonable timeframe because of the delay tactics of the anti-Semitic mob. Denying an application "without prejudice" because the Board did not complete its review in a timely manner would eviscerate this law, which states:

> Failure of the board of adjustment to act within the period prescribed
> shall constitute approval of the application, and a certificate of the

---

[16] Objectors planned to offer the testimony of up to five expert witnesses which, if it took one and a half years to get through the Plaintiffs' seven witnesses, would likely take at least another year just for that phase, which does not include the testimony of any other of the thousands of opponents to the Yeshiva. Jennings Decl. Exh. MM at 3.

34

administrative officer as to the failure of the board of adjustment to act shall be issued on request of the applicant, . . . .

N.J.S.A. § 40:55D-76(c); *see also* Jennings Decl. Exh. NN (Board Rules of Procedure § 3:1-3 requiring same). "[F]ail[ure] to comply with [state] law" "support[s] [a plaintiff's] claim that it has sustained a substantial burden." *WDS II*, 504 F.3d at 352; *see also Saints Constantine and Helen Greek Orthodox Church v. City of New Berlin*, 396 F.3d 895 (7th Cir. 2005) (same). There is no basis for any exception from this requirement, as the delay has not been caused by any "inadvertency" or "mistake" on the part of the Board. *See Amerada Hess Corp. v. Burlington Cty. Planning Bd.*, 195 N.J. 616, 644 (2008) (it is "only when government inaction is unintentional or inadvertent that the time frames are subject to relaxation"). Rather, "[w]here a board fails to act within the statutory limits, <u>even for what it considers 'good' reasons</u>, the statute is violated and automatic approval comes into play." *Id.* at 637 (emphasis added).

Additionally, the Yeshiva repeatedly requested that some consideration should be made, including extended or additional hearings, reasonable limitations on objectors' questioning and testimony (all permitted under New Jersey law), and a deadline by which the application would be voted on. *See, e.g., Deegan v. Perth Amboy Redevelopment Ag'y*, 863 A.2d 416, 422 (N.J. App. Div. 2005) (permitting planning board meeting to continue past midnight); *DeMaria v. Jeb Brook, LLC*, 855 A.2d 628, 632 (N.J. App. Div. 2003) (acknowledging that a 5-minute limitation on

cross-examination is reasonable). The objectors objected to such reasonable conditions, and the Board refused to adopt any of them. Jennings Decl. Exh. MM at 4; Jennings Decl. Exh. EE at 7:11-20. Ultimately, the Yeshiva asked the Board if it could commit to any date for completion of the hearings, and the Board stated that it "cannot give an answer as of this juncture." Jennings Decl. Exh. EE at 6:18-19.

Second, the substantial hostility directed at the Yeshiva that has resulted in undue delay and expense and which is motivated by anti-Semitic animus as described above, has created, at the very least, substantial uncertainty as to whether the Yeshiva would ever be able to exist in the Township.

> [A] burden need not be found insuperable to be held substantial. *See Saints Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 901 (7th Cir.2005). When the school has no ready alternatives, or where the alternatives require substantial "delay, uncertainty, and expense," a complete denial of the school's application might be indicative of a substantial burden.

*WDS II,* 504 F.3d at 349; *see also Tartikov,* 2015 WL 5729783, at *41 (holding that "seeking a zoning change or text amendment would be a futile exercise . . . or at the very least would be fraught with delay, which may harm, or even completely undermine, Plaintiffs' ability to construct the proposed rabbinical college.").

Third, even if the Yeshiva continued to consent to interminable extensions of the state-imposed deadline, the practical effect of waiting a significant and open-ended period of time for the hearings to conclude would be to prevent the use altogether, as the Yeshiva needs a functioning school by September of 2016. Unless

36

renovations begin very soon, this will be an impossibility. *See infra*, § II(b). This delay would itself have been an effective and complete bar to the Yeshiva's religious exercise. *See Layman Lessons, Inc. v. City of Millersville, Tenn.*, 636 F. Supp. 2d 620, 649 (M.D. Tenn. 2008) ("By thus preventing or at a minimum delaying Layman Lessons' ability to use the Property, the City did not merely make Layman Lessons' religious exercise 'more expensive or difficult'; instead, it <u>effectively barred</u> Layman Lessons, a religious institution, 'from using its property in the exercise of its religion.'" (emphasis added)); *Church of Our Savior v. City of Jacksonville Beach*, 108 F. Supp. 3d 1259, 1270 (M.D. Fla. 2015) (requiring church to secure development plan approval within twelve months of its permit being issued "is sufficiently burdensome as to operate as an <u>effective denial</u> of the Church's application" because of the likelihood of appeal of the decision, which is "is unlikely to be decided" within twelve months (emphasis added.)); *Munns v. Martin*, 930 P.2d 318, 325 (1997) ("the *potential* of an additional 12 months of delay under the Walla Walla ordinance is an administrative burden. This is not a de minimis delay. In our cases, the *potential* burden of an ordinance creates constitutional infirmity."); *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012) (describing the "lengthy [environmental] review process [that] was costly to the Church"); *Roman Catholic Diocese of Rockville Centre, N.Y. v. Incorporated Village of Old Westbury*, No. 09-5195, 2012 WL 1392365, at *13 (E.D.N.Y. Apr. 23, 2012) (noting claims of

37

unjustifiable delay in review process). This Court held that even the delay in granting a zoning permit to train priests can constitute a substantial burden:

> The delay in approving the application to use the property as a school, which resulted in substantial expenditures for a property which could not legally be used, raises a right to relief above a speculative level on a claim that the City implemented a land use regulation in a manner that imposed a substantial burden on the Church's use of the property to train priests— a religious exercise.

*Israelite Church of God in Jesus Christ, Inc. v. City of Hackensack*, No. 11-5960, 2012 WL 3284054, at *1-2 (D.N.J. Aug. 10, 2012). *See also World Outreach Conf. Ctr. v. City of Chi.*, 591 F.3d 531 (7th Cir. 2015) (two year delay in the granting of required licenses, among other things, could give rise to a RLUIPA substantial burden claim); *Reaching Hearts Int'l, Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 786 (D. Md. 2008), *aff'd*, 368 F. App'x 370 (4th Cir. 2010) ("RHI presented evidence of how Defendant's actions led to RHI's expenditure of substantial funds and resulted in delay and uncertainty," which "also qualify as a substantial burden").

The legislative history of RLUIPA demonstrates that undue delay is itself a substantial burden on religious exercise. *See* 146 CONG. REC. S7776 (daily ed. July 27, 2000) (noting that RLUIPA does not "relieve religious institutions from applying for variances, . . . where available without discrimination or unfair delay."). And if there ever was a case of "unfair delay," this is it. The Yeshiva realized that there was a concerted effort to pack hearings, delay proceedings and win through attrition when the local community dragged out the testimony of the Yeshiva's sound expert

38

(who testified about the sound of rabbis praying) for several hearings, from July through December of last year. As the attorney for a handful of objectors[17] stated, "there are over 1,000 townspeople on average attending these meetings and the objectors have not had an opportunity to present their case." Jennings Decl. Exh. MM at 4. As the Board Chairman stated, "this application will continue for as long as we need it to for everyone's concerns and everybody here to be heard, if that's what it takes." Jennings Dec. Exh. S at 6:17-20. There is no question that the Yeshiva was subjected to unjustifiably protracted and unfair hearings designed to drain the Yeshiva of resources and force it to surrender, just as the prior two yeshiva applicants had.

3. *Complete prohibition of the Yeshiva's use and total denial of its use variance is not the least restrictive means of achieving any compelling governmental interest.*

A compelling interest is one that prevents "some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. 398, 403, 408 (1963) ("only the gravest abuses, endangering paramount interests, give occasion for permissible limitation, . . . ."); *WDS II,* 504 F.3d at 353 (compelling state interests are "interests of the highest order." The Supreme Court has ruled that generalized statements of

---

[17] Mr. Poulos only represented five objectors because if an objector is represented by counsel, they cannot participate in cross-examination or testify themselves. Jennings Decl. Exh. JJ at 13:24-14:1. This leaves the rest free to individually question witnesses and testify.

interest are insufficient and that governments must establish that prohibiting the "particular use at issue" must be necessary to protect the public health and safety. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 432, 438 (2006) ("[I]nvocation of such general interests, standing alone, is not enough."); *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015) (internal quotations omitted) ("But RLUIPA, like RFRA, contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant . . . ."). The law must also be "<u>necessary</u> to serve the asserted [compelling] interest," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 395 (1992) (emphasis added), in other words, that it is the least restrictive means of achieving those interests.

Significantly, the Township has already made the determination that a use similar to the Yeshiva's is most appropriately located in this zoning district. As discussed above, boarding schools are only permitted in two zoning districts in the Township, with the highest density in this R-4 district. Moreover, the Property, which is located exactly at a transitional point between single-family residential, apartment buildings, and commercial uses, is ideal for this use. Jennings Decl. Exh. F. If the Yeshiva's use is to be permitted <u>anywhere</u> within the Township—and the First Amendment and RLUIPA requires that it is—this location is best suited for it. And, as described above, the Yeshiva repeatedly stated that it would agree to any

40

reasonable condition to mitigate impacts.

The *yeshiva gedola* will not create any negative land use impacts, and will generally improve existing conditions. There is no question that the Yeshiva's use will dramatically decrease the traffic impact of the current day school use—where students are dropped off and picked up every day—and be much less than other, permitted uses on the Property. Jennings Decl. Exh. S at 98:14-25 (traffic generation would be "significantly lower" for the Yeshiva's use than for the existing use). The "noise" of students praying, raised as a pretext by numerous community members, many of whom live miles away from the site, is a non-issue. Jennings Decl. Exh. T at 37:3-7 (sound impact will be "both immeasurable and inaudible at the closest residential property line"). Even if it was not, the Township can enforce its own noise ordinances, and the Yeshiva can use sound-deadening windows and other means of mitigating such "impact." *Id.* at 41:2-42:25. Furthermore, there is no question that the use will have a positive aesthetic impact. Jennings Decl. Exh. N.

Finally, other purported concerns of community members should not be given currency by this Court. Complaints about the Property's tax exemption are irrelevant to a use variance proceeding, *see Medical Ctr. at Princeton v. Princeton Twp. Zoning*, 778 A.2d 482, 497 (N.J. Super. Ct. 2001) (holding that "tax exemptions and zoning concepts are disparate concepts"), and also irrational as the Property had been tax-exempt for decades. Finally, the repeated fears concerning

Haredi "men wandering our streets," *see* Exhibit Jenning Decl. Exh. U at 2 ("I am mostly upset about the fact that there will be 100 undocumented men in the neighborhood roaming around my daughter and her friends."); Jennings Decl. Exh. S at 31:15-17 (Board Chairman questioning Rabbi: "these are men who can walk off any time they want regardless of what you -- . . . ."), are not legitimate bases to prevent religious land use but rather the type of "negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding" that have been rejected by the Supreme Court in Equal Protection challenges to zoning prohibitions. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). *See also* Jennings Decl. Exh. S at 48:12-16; (fear of "the comings and goings of 96 20-year-olds"); *id.* at 56:18-21 (fear that students may be "convicted criminal[s or] sex offender[s]"). *See also Open Homes Fellowship, Inc. v. Orange Cty., Fla.*, 325 F. Supp. 2d 1349, 1360 (M.D. Fla. 2004) (granting summary judgment to church where "there is no record evidence to suggest that because Open Homes' men are recovering addicts they present a special safety threat."). These fears also ignore the existence of various non-single family uses nearby such as the Garden Apartment complex directly behind the Property, or the storage facility, diner, shopping center or Seven-Eleven and many other commercial uses.

    D. <u>The Yeshiva is Very Likely to Succeed on its "Equal Terms" Claim.</u>

    RLUIPA's Equal Terms provision establishes that "[n]o government shall

impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).  In the Third Circuit, "a plaintiff asserting a claim under the RLUIPA Equal Terms provision must show (1) it is a religious assembly or institution, (2) subject to a land use regulation, which regulation (3) treats the religious assembly on less than equal terms with (4) a nonreligious assembly or institution (5) that causes no lesser harm to the interests the regulation seeks to advance." *Lighthouse,* 510 F.3d at 270.

The Third Circuit also interprets this provision as a strict liability provision. Specifically, "if a land-use regulation treats religious assemblies or institutions on less than equal terms with nonreligious assemblies or institutions that are no less harmful to the governmental objectives in enacting the regulation, that regulation -- without more -- fails under RLUIPA." *Id.* at 269.  In this case, the first two elements of the Equal Terms test are easily satisfied. The Yeshiva is a religious institution, and it is subject to the LDO, which is a land use regulation. The remaining three elements are also satisfied, whether applied to the entire jurisdiction or only to the R-4 district.

The LDO permits a number of educational facilities within the Township. Specifically, the LDO permits public, private, parochial and boarding schools for students under the age of 18. The LDO further permits nonreligious schools for

43

students older than 18 years, including "Art schools," "Dance schools," "Music schools," and "Business schools." Other assembly or institutional uses permitted in the Township are "Indoor Recreation Facilities," "Tavern," "Funeral services," "Health Clubs," "Museum," "Nursing Home," "Physical culture and health establishments," "Shopping Center," "Quasi-public uses including clubs, lodges, and similar uses," "Child Day Care Centers," "Movie Theater, Indoor," "Amusement center – game room," "Auditoriums," and "Library." *See supra.* Religious schools for students over the age of 18 are prohibited. As the Yeshiva's use is prohibited throughout the jurisdiction and myriad assembly and institutional land uses are permitted, unless the "interest" that the entire LDO seeks to advance is only to prohibit religious schools for adults (which would be unconstitutional), the remaining three elements of the Equal Terms test are met.

In the R-4 zoning district itself, the LDO lists a number of assembly and institutional uses that are permitted subject to approval by the Planning Board. Jennings Decl. Exh. D § 21-26.1(c) (listing public schools, boarding schools for those under 18, government buildings and services, and community recreation centers). Again, the Yeshiva's use is prohibited outright. Thus, elements three and four of the Equal Terms test are thus satisfied with respect to the R-4 district.

The final element of the test, whether the Yeshiva's proposed use threatens the LDO's regulatory objectives to a greater degree than the permitted

44

nonreligious assemblies and institutions, is also easily met.  The interests that the

Ordinance seeks to advance in the R-4 district are stated as follows:

> The purpose of the R-4 residential zone is to provide for smaller lot sizes
> to meet the desires of a certain segment of the population who need and
> desire lower cost housing and to zone the area in conformance with
> existing lot sizes. The provisions and regulations set forth herein
> encourage the future development and maintenance of this area as a
> residential area.

Jennings Decl. Exh. D § 26-24.  *See Lighthouse,* 510 F.3d at 272-273 (awarding

summary judgment to church where municipality could not explain why it would

cause greater harm to regulatory objectives than nonreligious assemblies).

The LDO presents a similar scenario, and can only withstand an Equal Terms

claim if religious schools and boarding schools for students over eighteen years of

age would cause greater harm than the various permitted uses listed above to the

regulatory goals of (a) providing lower cost housing; and (b) encouraging the

development and maintenance of the area as a residential area.  It cannot.  None

of the permitted assembly or institutional uses—public schools, government

buildings and services, and community recreation centers (which are defined as "a

public or quasi-public facility offering a variety of recreational, social and

educational programs and services to the general public or it's [sic] members."

Jennings Decl. Exh. D § 21-6 (emphasis added))—advance either of these goals,

which are directed at residential land use.  None of these permitted uses are

residential land uses, low-cost or otherwise.  The Township has thus made the

legislative determination that various nonreligious land uses are compatible in this zoning district. There is no basis to conclude that a *yeshiva gedola* would cause any <u>greater</u> harm to the LDO's regulatory objectives. In fact, as the school would provide residential facilities for its students rather than a day school where students are dropped off and picked up every day, it is <u>more</u> compatible with the stated goals. *See Midrash Sephardi*, 366 F.3d at 1231 (private clubs and lodges held to be valid comparators); *Church of Our Savior v. City of Jacksonville Beach*, 69 F. Supp. 3d 1299, 1322-23 (M.D. Fla. 2014) (school was a proper Equal Terms comparator); *Corporation of the Catholic Archbishop of Seattle v. City of Seattle*, 28 F. Supp. 3d 1163, 1169 (W.D. Wash. 2014) (public school was valid comparator in challenge by private school).

As in *Hope Rising Cmty. Church, supra*, the relevant facts are not disputed and injunctive relief is appropriate. *See* 2015 WL 7720380, at \*4-\*5 (granting preliminary injunction in favor of church where church use requires conditional use permit but parks, playgrounds and educational institutions are permitted uses, and City failed to show a church "would cause greater harm to the Light Industrial District and its objectives" than such permitted uses).

## VI. PLAINTIFF YESHIVA WILL SUFFER IRREPARABLE INJURY IF THE INJUNCTION IS DENIED, AS IT WILL BE UNABLE TO ENGAGE IN RELIGIOUS EDUCATION AND WORSHIP IN THE COMING ACADEMIC YEAR.

A. <u>Deprivation of First Amendment Freedoms Is *Per Se* Irreparable Injury.</u>

46

"[T]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). "This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Opulent Life Church v. City of Holly Springs Miss.*, 697 F.3d 279, 295 (5th Cir. 2012); *see also Reaching Hearts Int'l*, 584 F. Supp. 2d at 795. Since the Defendants are currently violating Plaintiffs' rights under RLUIPA and the First Amendments, and the Plaintiffs have a strong likelihood of success these claims, they have successfully shown that it is currently suffering irreparable harm and will continue to do so if a preliminary injunction does not issue.

### B.   The Yeshiva Will Lack a Home for Its Religious Education and Worship Activity Unless It Begins Interior Renovations Immediately.

It is critically important that the Yeshiva begin construction of the interior renovations of the existing school building immediately if it is to have any chance that the *yeshiva gedola* will be up and operational in Ocean Township this Fall. The Yeshiva's intent is to use the existing building essentially "as is" by converting classrooms to dormitory rooms. As the existing building is used today, it is considered an "E" Building classification because the students are in the twelfth grade or below. Carlidge Decl. ¶ 6. Once the use of the existing building is

47

converted to a *yeshiva gedola,* it would be changed to a mixed use building containing "R-2" and "A-3" under the building code because the students are post-high school. *Id.* ¶ 7. The change in use triggers an analysis under the New Jersey Rehabilitation Subcode ("NJRS"), N.J.A.C. 5:23-6, and that determines what has to be done to occupy the same as a *yeshiva gedola. Id.* ¶ 8.

Under the NJRS, the following interior modifications need to be completed to the existing building: (a) enhance the restroom facilities (*e.g.,* increase the number of fixtures) to meet the requirements of the proposed new uses which are R-2 and A-3; (b) provide accessible restroom facilities; (c) modify interior doors to provide required clearances (approximately 50% of the classroom and other interior doors will need to be modified to provide a minimum of 32" clear to meet accessibility requirements; (d) provide smoke detectors and carbon monoxide detectors for the proposed R-2 use; (e) revise, reconfigure, and update the sprinkler system because each use has certain coverage requirements; and (f) update the HVAC system to provide the ventilation rates as required by the new uses (*e.g.,* each use has certain ventilation requirements). *Id.* ¶ 9.

In addition, programmatic changes to the interior of the existing building also need to be made. For example, partitions must be installed in some of the existing classrooms, and a residence suite with a restroom for the faculty advisor who will reside on the Property with the rabbinical students must be provided. *Id.* ¶ 10.

Prior to construction, the Yeshiva will need to secure several permits from the Township Building Department as follows: a) demolition permit; b) building permit; c) electrical permit; d) plumbing permit, e) mechanical permit; and f) energy code compliance approval. *Id.* ¶ 11. If the Yeshiva files for the necessary permits to secure approval for the proposed renovations, the review process by the Township Building Department should take no more than twenty days pursuant to N.J.A.C. 5:23-2.16. *Id.* ¶ 12. Once the permits are issued, construction of the proposed improvements will take approximately five months. *Id.* ¶ 13. Thus, time is of the essence in this matter as any further delays will surely result in the Yeshiva missing the opportunity to open the *yeshiva gedola* this Fall. The Yeshiva is willing to secure these permits and begin the necessary construction work at its own risk.

## VII.  GRANTING PRELIMINARY RELIEF WILL NOT RESULT IN ANY HARM TO THE DEFENDANTS.

If this Court grants a preliminary injunction in favor of the Plaintiffs, the Defendants will not be harmed in any way. The Yeshiva simply asks for an order directing the Township to cease enforcement of ordinances that violate statutory and constitutional provisions and suppresses religious freedom. Renovating the interior of the building will create no harm to anyone. Furthermore, the Yeshiva poses no threat of harm to the goals of the R-4 District or the Township as a whole.

## VIII. PRELIMINARY RELIEF WILL SERVE THE PUBLIC INTEREST.

Finally, "[t]he public interest in the protection and enforcement of civil

49

rights and anti-discrimination laws generally weighs in favor of granting injunctive relief against violations." *ReMed Recovery Care Ctrs. v. Township of Willistown*, 36 F. Supp. 2d 676, 688 (E.D. Pa. 1999) (citing *Oxford House-Evergreen v. Plainfield*, 769 F. Supp. 1329, 1345 (D.N.J. 1991)). In this case, the Yeshiva seeks an injunction that will protect and enforce not only its own civil rights, but also those of every religious educational institution that seeks to operate in the Township. Since the public interest always supports the enforcement of civil rights and the prevention of discrimination, and the Yeshiva has shown a high likelihood of success on the merits of its claims, the public interest clearly supports granting a preliminary injunction in this case.

## CONCLUSION

In sum, the Yeshiva simply seeks to be able to exist within the Township within an already-existing school, and to be treated fairly and equally in relation to nonreligious assemblies and institutions. As explained above, the factors for a preliminary injunction weigh heavily in favor of the Plaintiffs. Thus, the Yeshiva respectfully requests that this Court grant its Motion.

Dated: February 2, 2016

Respectfully Submitted,

**WILENTZ, GOLDMAN & SPITZER, P.A.**

By: _____

Donna M. Jennings

50