OT14032D



To: **Ocean Township Zoning Board of Adjustment**

From: **James W. Higgins Associates — Planning Consultant**

Subject: **Yeshiva Gedola Na'os Yaakov, Inc - Use Variance and Minor Site Plan**

        Engineering Plans - 4 Sheets: 1 of 4 thru 4 of 4 - Dated 4/14/14
        Rev. 2/24/15
        Architectural Plans - 5 Sheets: A-1 thru A-5 - Dated 5/21/14
        Rev. 11/24/14

Location: **Block 216 Lot 19 — 1515 Logan Rd.**

Zone: **R-4 Residential Zone**

Date: **May 13, 2015**

## Application

The applicant proposes to modify and utilize an existing school building for a boarding school, more specifically a Talmudic Academy, where up to 96 students will be attend and be boarded. The students will range from 18 to 22 years of age.

The applicant has submitted revised plans in response to comments by the Board and its professionals at the February 24, 2015 hearing.  This report supersedes my report of December 9, 2014 in its entirety.  Underlined sections are new or changed items from the December 9, 2014 report.

The revised plans propose significant changes to the site and the building.  These changes include:

1. Elimination of the driveway access, trash enclosure and paving on the north side of the site adjacent to the residence on the north side.

2. <u>The provision for 25 parking spaces along the south side of the building and behind the building.</u>

**Land Use Planners**
823 W. Park Blvd. #261
**Ocean Township, New Jersey, 07712**
**732-493-3065 • 732-493-3108 (fax)**

3. The provision of significant landscaping in the front of the site around the building foundation, along the northern property line, and in the parking area.

4. <u>The provision of a loading and trash area at the rear of the building, approximately 180' from the northern property line and 135' from the southern property line.  This location is a significantly greater distance from the residence to the north than provided on previous plans.</u>

5. Significant changes to the layout and facade of the building.

6. A proposed site lighting plan.

## Site Description and History

The site is a 2.927 acre parcel with approximately 336' of frontage on Logan Rd.  It is occupied by a school building and accessory facilities including parking, fencing and outdoor paved areas.

The site had originally been used as an elementary school, and was given conditional use approval in 1997 to allow the boarding of students in grades 9 thru 12, with no student being older than 18 years of age at the beginning of the academic year.  A maximum of 50 persons, including students and staff, was permitted on the site between the hours of midnight and 6 am.  That use operated on the site for several years but has been discontinued and the site was subsequently used as an elementary school.

In 2010, a use variance application was submitted to allow up to 34 students, ages 18 to 20, to attend and be boarded at the school.  That application was withdrawn.

## Surrounding Land Uses

The site is bordered by: residential uses to the south, north and across Logan Rd. to the east;  apartments to the west; Dave Dahrouge Park to the southeast across Logan Rd., and commercial uses to the southwest.

## Variance Analysis

The site is located in the R-4 District.  The proposed Talmudic Academy is not a permitted use in the zone, and a D-1 variance is necessary.

**"D"  Variance Analysis**

The application requires a "D-1" variance.   Consequently, the applicant must demonstrate that the general welfare is advanced because the site is particularly suited to the use or, in the alternative, that the use is an inherently beneficial use as defined in the MLUL or as determined by the Courts.  While, to my knowledge, there is no court case that establishes a Talmudic Academy, as proposed, to be an inherently beneficial use, given the religious and educational aspects of the use the Board could make a finding that the use is inherently beneficial.  Otherwise, the applicant would have to demonstrate that the general welfare is advanced due to the particular suitability of the site for the use.

The applicant must also demonstrate that the granting of the variance will not result in a substantial detriment to the public good, and will not substantially impair the intent and purpose of the Zone Plan, which includes the Master Plan and Zoning Ordinance.  In the case of an inherently beneficial use, a 4 step evaluation is necessary to demonstrate that the detriments associated with the use will not substantially outweigh the benefits.  That 4 step process is as follows:

1. Establish the magnitude of the benefit.  The applicant needs to provide testimony as to the magnitude of the benefit.

2. Identify any detrimental impacts that may result from the proposed use.  Legitimate issues to be considered include noise, odors, visual impact, drainage and traffic.  The applicant should provide testimony as to the potential impact of the proposed development in these regards.  Specific concerns include: recreational activity in the evening and on weekends - both inside and outside; timing, location and frequency of deliveries of food, laundry, and academic supplies to the site; the nature of any outdoor activity other than recreational; policy on automobiles and how it can be enforced; trash storage and removal - location, frequency and time of collection; the safety of site access; and the physical appearance of the site and site amenities.

   Considerations should include not only the impact on surrounding properties, but the impact on the intent and purpose of the zoning ordinance.

   In that regard, the governing body was very clear that it did not want to allow institutions that boarded adults.  The Ordinance provisions that permit Boarding Schools contain 3 very strong provisions in this regard.

   First, it defines parochial schools as being limited to "Kindergarten through Grade l2".

   Second, the specific conditions pertaining to Boarding Schools not only limit the grade levels to grades 9-12, but go on to further state that ***"in no case"*** shall students who are 18 years old or older at the beginning of the school year be

allowed to board at the school. It was very clear that the governing body intended that students over the age of 18 not be permitted in boarding schools.

Third, the specific conditions pertaining to Boarding Schools limit the total number of persons on site between midnight and 6 am to 50, which includes students and staff. The subject proposal proposes nearly double that number.

Having been involved in the development of the Ordinance, and having drafted the final copy, I have intimate knowledge of, and can explain to the Board the reasons for this very strong language.

> First, the Ordinance was developed as the result of a rezoning request by the former operators of this site. That request was geared towards this site. While the Ordinance was not site specific, it gave specific attention to this site and the surrounding area of the site, giving consideration to the impact on surrounding residential uses.

> The reasons for the strong wording and specific prohibition of students over the age of 18 are that such students are no longer minors, and also tend to own or drive automobiles. The Governing Body was concerned that a concentration of young adults at such a facility, with or without cars, would be disruptive to the surrounding residential neighborhood, particularly if larger groups of students came and left the facility late at night. Ownership of vehicles could facilitate such activities and there is no effective way to control this potential problem since these are young adults, and not minors.

> Another reason was that, since the occupants are young adults, and not minors, there is no legal requirement for overnight onsite adult supervision, and there is no legal way the Board could require boarding students to remain on site overnight.

> With regard to the provision limiting the number of persons staying overnight to 50, the governing body took into account the nature of the site, the nature of the surrounding area, and the zoning. For example, a 2.9 acre site could be developed - at a generous maximum - for 12 single family dwellings which, generously assuming an average household size of 4, would have a total population of 48. (A more realistic analysis would result in a population of closer to 30.)

> The governing body also realized that, even if students were prohibited from having automobiles on site (as suggested by the applicant for the rezoning at that time), there was no way to control a situation where students owned or kept personal automobiles off site - such as parking them on local streets, in the park parking area on Park Blvd., or in local

    commercial parking lots.  This would not only impact local streets and parking areas, but could result in students parking in these areas late at night and again disrupting the neighborhood.

    The applicant has testified that his specific operation has controls in place that will accommodate these concerns.  However, it may be difficult for the Board to limit an approval to this specific institution.  There is always a concern that, at some time in the future, a different organization with different operative parameters will want to utilize the facility.  The recent past history of this site, with several uses in the last 10 years, gives credence to this concern.

3. Provide any mitigating measures to reduce the impact of any identified detrimental impacts of the proposed use.  After addressing the above potential impacts, and any others that may be deemed pertinent by the Board, the applicant should propose any mitigating measures that would reduce the magnitude of these impacts.

4. Balance the benefits of the development against the identified and, if necessary, mitigated detrimental impacts.  This aspect of the test is the most important of the issues, and demonstrates the value to which the Supreme Court placed on "inherently beneficial uses".  Normally, with regard to variances - either bulk or use - the test is whether or not the benefits substantially outweigh the detriments.  If a detriment is equal to or greater than the benefit, regardless of the nature of the benefit or special reason, a variance should be denied.  Where inherently beneficial uses are concerned, however, the test is different.  In order to deny an application for a "D-1" variance for an inherently beneficial use, it must be demonstrated that the detrimental impacts substantially outweigh the benefits.  This test is why it is important for the applicant to clearly establish the magnitude of the benefit.


**Bulk Variance Analysis**

Section 21-20.26 of the Ordinance - Compliance With Bulk Standards - states:  "Any use not permitted in a zone but for which approval is given by the Zoning Board of Adjustment shall comply with the bulk standards of the most restrictive zone in which the use is permitted, as determined by the Zoning Officer.  If the use is not permitted in any zone within the Township, the standards applying to the most restrictive zone within which a similar use is permitted, as determined by the Zoning Officer, shall apply.  Where no such similar use exists, the standards of the subject zone shall apply."

Since this is an application for a new, non-permitted use on the site, which is much more intense than the prior uses of the site, the new use must comply with the appropriate bulk standards.  In this instance, the Zoning Officer has determined that, while the use is clearly different than a Boarding School, of all the permitted uses in the

Ocean Township Zoning Board of Adjustment                                                                Page  6
Yeshiva Gedola Na'os Yaakov, Inc.
May 13, 2015

Ordinance, the use is most similar to a Boarding School and that the standards of Section 21-51.30.c. apply. Consequently, while the site plan and building are pre-existing, and some bulk variances may have been granted for previous uses, they were not granted as they relate to the proposed use.  Consequently, a detailed analysis of the site plan and architectural plans is necessary to determine what bulk variances are necessary.

The following bulk variances are necessary:

**21-51-30.c(1) Minimum Side Yard Setback** - The Ordinance requires a 40' side yard setback for a Boarding School in the R-4 Zone.  The existing side yard setback on the north side is 23'.

> The north side of the building consists of a 20' wide, 2-way driveway that accesses the parking in the rear of the site, and a 3' wide unpaved area that is not landscaped.  The applicant proposes to remove that paved driveway and provide landscaping along the northern property line.  The landscaping will include a row of 24 Norway Spruce, 6' - 8' high, and spaced 8.5' on centers.  A solid white vinyl fence, 4' high in the required front yard and 6' high west of the required front yard, is also proposed along the property line in this area.  No detail of the fence is shown on the plans.  A detail should be provided as a condition of approval, should the Board choose to approve the application.
>
> The portion of the building in this location, as proposed, consists of a 2,230 sq. ft. study hall, a 766 sq. ft. library (both on the first floor), and a proposed 744 sq. ft. second story classroom located over the library.
>
> Given the fact that classes run until 11:15 PM, and that the bulk of the activity on the site will occur in this portion of the building, testimony should be provided as to how this activity will impact the adjacent residence to the north.  Of particular concern is the intensity of the use - 96 students - an the late hour.  It is unlikely that all of the students will leave the classroom immediately after class, so that activity in this area will likely continue until at least 11:30 PM and possibly later.  The elimination of the driveway and installation of plantings and fencing on the north property line will help mitigate these potential impacts from the use of the building at night. However, there are 9 large windows ( 8' high by 4' wide) in the gymnasium that are situated 8' to 16' above grade and face the residence to the north.  These windows will likely transmit significant light, and are located well above the 6' fence and 8' height of the Norway Spruce trees proposed to be planted.  It is very probable that there will be impact on that residence from light from these windows unless something is done to cover the windows.

**21-51-30.c(2) Minimum Side Yard Buffer** - The need for this variance has been eliminated.

**21-44.1.m  Sign** - The Ordinance permits a monument sign of up to 60 sq. ft. for an institutional building in a residential zone.  The plan proposes a 109 sq. ft. facade sign, which is not permitted.  (Note - sign area is determined by "the total square foot content of the background upon which the lettering, illustration or display is presented".  The background is 5'7" x 19' 6".)

> The illustration itself is less than 60 sq. ft. in area.  The sign is attractive and will not be a detriment, in my opinion.  I defer to the Board engineer with regard to the adequacy of the proposed sign lighting.

**21-45.5.b.  Landscaped Islands** - The Ordinance requires 10' wide landscaped islands at the end of all rows of parking.  There is 1 instance where an 8' wide island is proposed.

> This island is located at the eastern end of the row of parking that faces the south side of the building.  It appears that the variance can be easily eliminated by moving the row of parking 2' to the west.

**21-45.5.c. Parking Space Width** - The Ordinance requires that parking spaces be a minimum of 10' wide.  The proposed parking spaces are 9' wide.

> The Board has previously granted variances on other applications to allow 9' wide parking spaces, in order to increase % landscaped area on the site, where it could be demonstrated that the proposed number of parking spaces can be provided without requiring variances.  The applicant should provide testimony as to the positive and negative criteria for approval of this variance.

**21-45.5.d.1 & 5. Drive Aisle Width** - The need for this variance has been eliminated.

**21-45.13  Number and Location of Curb Cuts** - The Ordinance limits all properties - except single family residences and uses in the I-1 Zone - to one curb cut.  It also requires the curb cut to be located in the center 1/3 of the lot.  The site has 2 curb cuts, and neither is located in the center 1/3 of the lot.

> There appears to be a logic behind providing the 2 curb cuts.  The reason for the northern curb cut is to allow vehicular access to the front entrance.  The southern curb cut will provide 2-way access to the parking area.  The southern driveway is aligned with Park Ave. to the east, which is the preferable alignment.

**21-45-17.b.1. Number of Parking Spaces** - There is no specific parking requirement for the proposed use listed in the Ordinance, however the use is most similar to places of public assembly and schools, so that the parking requirement for that use applies. That requirement is 1 space per 100 sq. ft. of floor area, or 185 spaces for the 18,500 sq. ft. building.  The proposed plan provides 25 parking spaces.

> In this instance it is clear that the parking requirement in the Ordinance is not a realistic reflection of the actual parking requirement for this use.
>
> The applicant has provided testimony that the students will not be able to have or operate cars while attending the Yeshiva. Consequently, it appears that the 25 parking spaces are adequate for this specific use.  However, there is a legitimate concern that the parking may not be adequate in the future if another operator assumes use of the building.  If the application is approved, a condition of approval should be that students not be allowed to operate vehicles while attending the Yeshiva.
>
> In addition, the applicant should discuss the process of arrival and departure for each semester as well as for holidays unless this has already been covered in testimony.

**21-47c..2  Minimum Side Yard Landscaping** - The need for this variance has been eliminated.

**21-48.4.a.  Fence Height in a Front Yard** - The Ordinance limits the height of any solid fence in a front yard to 3'.  The plan proposes a 4' high solid vinyl fence 25' from the front property line along the northern property line, where the required front yard setback is 50'.

> Given the nature of the use, it is probable that a 4' high fence would be appropriate.

## Design Waiver Analysis

## Waivers

**21-55.1.g.  Underground Sprinkler System  —** The Ordinance requires that all landscaped areas be provided with an underground sprinkler system.  No sprinkler system is indicated on the plan.

> A sprinkler system should be provided for all new landscaping.

Ocean Township Zoning Board of Adjustment                                                                 Page  9
Yeshiva Gedola Na'os Yaakov, Inc.
May 13, 2015

**21-55.2.a.1 Tree Location and Preservation Plan** - The Ordinance requires that all site plans provide a tree location and preservation plan, locating all trees within 30' of disturbed areas. It is clear that a number of trees are to be removed in the front yard. No such plan has been provided.

> <u>There are some trees along the street line that will be removed.  Information should be provided with regard to the size and number of these trees. The plans propose the equivalent of 38 replacement trees, so that it appears that the requirement for tree replacement has been met.  This should be confirmed in testimony.</u>

**21-55.2.a.2 Number of Trees**  - The need for this waiver has been eliminated.

**21-55.2.a.3 Street Trees**  - The need for this waiver has been eliminated.

## Additional Comments

1. The plan proposes to retain the existing chain link fencing on the west and south side of the site.  The condition of this fencing is poor.  I recommend that all existing fencing be inspected and repaired, replaced or removed where appropriate.  Existing fencing that is to remain should be identified on the plan as to type and location.

2. Details of the proposed fencing should be provided.

James W. Higgins, P.P.

.